322 So.2d 854 (1975)
Rene CASADABAN and Ernest Casadaban d/b/a Casadaban's Nursery, Plaintiffs-Appellants,
v.
BEL CHEMICAL & SUPPLY CO., INC., et al., Defendants-Appellees.
No. 10472.
Court of Appeal of Louisiana, First Circuit.
November 24, 1975.
*855 Garic K. Barranger, Covington, for plaintiffs-appellants.
Frederick B. Alexius, and Carl J. Schumacher, Jr., New Orleans, for defendants-appellees.
Before SARTAIN, BAILES and PICKETT, JJ.
PICKETT, Judge.
Plaintiffs Rene and Ernest Casadaban are the proprietors of a large nursery business near Abita Springs in St. Tammany Parish, Louisiana. In the summer of 1964, the Casadabans purchased a herbicide known as Dacthal 75 for weed control on approximately twelve acres of their property, being the portion of their operation devoted to growing azaleas. The herbicide was applied to the azalea beds and, during the months that followed, the azalea crop sustained substantial damages. A large number of the plants died and others were rendered unmarketable.
This suit for damages to the azalea crop was instituted against Diamond Alkali Co., Inc., the manufacturer, and Bel Chemical and Supply Co., the distributor, of the herbicide Dacthal 75, and Aetna Casualty and Surety Co., Diamond's insurer.
The trial judge found that the herbicide did cause damage to a large number of the azaleas but held that the plaintiffs had failed to prove with reasonable certainty the number of plants damaged or the extent of their commercial losses. The Judge did render judgment in the principal amount of $11,424.00, apparently on the basis of Rene Casadaban's testimony the damages necessitated about six months of remedial and restorative work by his employees, at a weekly payroll rate at that time of $476.00.
The plaintiffs have appealed contending that the evidence was sufficient to support an award for their commercial losses. The defendants answered the appeal, contending that the trial judge erred on the question *856 of liability and that the evidence was insufficient to support even the award for restoration expenses. We affirm with respect to the findings, of the defendant's liability and the plaintiffs' failure to prove commercial losses; the award for the actual expenses incurred by plaintiffs, for reasons hereinafter stated, will be amended.
In August of 1964, Mr. Ronald Dezember, a Bel sales representative, visited the Casadaban's nursery and discussed the use of Dacthal, for weed control purposes, with Mr. Rene Casadaban. Mr. Casadaban had heard of the product through an acquaintance, a nurseryman in Texas, who had had satisfactory results with it, so that the question of Dacthal's effectiveness in this respect was not crucial in Mr. Casadaban's mind. The testimony of both Mr. Casadaban and Mr. Dezember shows, however, that the former was quite concerned about the effect Dacthal might have on his azaleas, and that he repeatedly sought (and thought he had received) a guarantee against any harmful results. Mr. Dezember's version was that he tried to explain he was without authority to make any such guarantee but said his company did recommend Dacthal as safe for use on azaleas and marketed the product for such use.
The parties eventually agreed upon the sale and other representatives of the defendants came to the nursery to help with the mixing of the Dacthal compound and the application of it to the azalea beds.
Within a few weeks, Mr. Henry Rester, a long-time employee of the plaintiffs, noticed that a number of the plants showed signs of problems. Leaves were drooping and discolored, and the plants failed to set buds as they should have done at that time of year, according to the normal life cycle. The difficulties continued over the next several months, and despite attempts to save the azaleas by fertilizing and pruning, a large number died or were rendered unmarketable for commercial purposes. During this period, Mr. Dezember and others visited the nursery at Mr. Casadaban's request to survey the situation, and Mr. Casadaban believed, according to his testimony at the trial, that he was receiving acknowledgements of the damage and assurances that his losses would be paid from these representatives of the defendants. Again, Mr. Dezember said he explained that he was without authority to do this and could only communicate the complaints to his superiors.
One morning in April of 1965, Mr. Casadaban and Mr. Dezember began a tour of the affected areas for the purpose of compiling an estimate of the extent of the damage. The azalea beds had dimensions of about eight or nine feet by two hundred feet and each contained as many as 3,500 young plants. The estimates were in the form of fractions of the total contents of each bed, with the predominant figure of "½" being shown on Mr. Casadaban's notebook, together with an occasional "1" or "¼". At noon, the two men broke for lunch with the estimates incompleted, and in mail, Mr. Casadaban found a letter from Diamond Alkali Company stating that the Company had heard of his problems from Mr. Dezember but was surprised to hear that Dacthal was thought to be the cause, in view of the Company's widespread, successful experience with the product.
Despite the import of this letter, Mr. Casadaban proceeded to dig up and dispose of the damaged plants and to restore and replant the affected areas for the following year's crop.
At the outset, we note that no question is raised with respect to the proper chemical composition of the Dacthal compound, the proper method of applying it, or the fact that Mr. Casadaban experienced substantial damage to his 1964-65 azalea crop.
The question is whether the Dacthal, properly manufactured and properly used, harmed the azaleas at the plaintiff's nursery.
*857 The circumstantial evidence in this case suggests an affirmative answer. In their years of growing azaleas both before and after the 1964-65 season, the plaintiffs never had a comparable experience. And even during the season at issue herein, the evidence shows that one entire bed contained normal, healthy plants; fortuitously, this bed was not treated with Dacthal because the supply plaintiffs had purchased was slightly less than enough for the total acreage.
In a civil case of this nature, the plaintiff's burden is to prove causation by a preponderance of the evidence and this burden may be met either by direct or by circumstantial evidence. Weber v. Fidelity & Casualty Insurance Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971). In Naquin v. Marquette Casualty Co., 244 La. 569, 153 So.2d 395 (1963), the Court stated the following:
"Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that it must negate all possible causes. Otherwise, the mere identification by the record of another possibility, although not shown to be causally active, would break the chain of causation." 153 So.2d at 397.
The trial judge in the instant case, however, determined causation on the basis of the testimony of Dr. James A. Foret, professor of horticulture at the University of Southwestern Louisiana, and appointed by the Court as an expert at the instance of both parties. Dr. Foret performed on-site tests on azaleas at the Casadaban's Nursery and attempted to duplicate as nearly as possible the conditions existing in 1964-65. The Court accepted Dr. Foret's reported findings that Dacthal, as applied, was injurious to the test azaleas.
The defendants, on the other hand, presented documentary evidence of literally hundreds of tests involving the use of Dacthal on a wide variety of crops, including azaleas, and having satisfactory results when the Dacthal was applied in the manufacturer's recommended amounts. The defendants also showed that Dacthal had been approved by the U.S. Department of Agriculture and that evidence of satisfactory test results was a prerequisite to obtaining such approval.
Some of the test data, however, showed a positive reaction to Dacthal by some varieties or sub-varieties of azaleas. Basically, the Indica azalea is a larger, stronger variety and was generally found to be unaffected. The Kurume azalea is a smaller and apparently more sensitive variety and includes a number of subvarieties such as Hampton Beauty, Snow, Christmas Cheer, Hinodegerii, and others, each of which was affected to a different degree in many tests.
The defendants further presented expert testimony by Dr. Lawrence Limpel, of the Boyce Thompson Institute for Plant Research, and by Dr. Joseph Ignatoski, of the Diamond Shamrock Corporation, generally to the effect that their experiences with Dacthal showed it to be a safe and effective product, though most of their testing was done on other crops. Dr. Raymond Self of Auburn University, also testified as an expert. He had visited the Casadaban Nursery in April of 1965, and had also made an inspection of Dr. Foret's experiments. In both instances, it was his opinion that the unhealthy condition of the azaleas was attributable to soil deficiencies, freeze damage or other causes.
In sum, the scientific evidence is somewhat in conflict but we can find no error in the trial judge's decision to accept the opinion of Dr. Foret. Certainly from a scientific standpoint, tests performed on the subject property and under similar conditions should be more reliable than tests performed elsewhere in the United States, under different soil and climatic conditions.
*858 The defendants also deny liability notwithstanding proof of causation on the basis of the following declaration by Diamond Alkali on the Dacthal label:
"We guarantee the contents of this package to conform to the labeled composition. Since use of this material is beyond our knowledge and control, we make no warranty, express or implied, as to the effects of such use whether or not in accordance with directions."
Defendants refer to Landreth Seed Co. v. Kerlec Seed Co., 12 La.App. 506, 126 So. 460 (Orl.App.1930) and California Chemical Co. v. Lovett, 204 So.2d 633 (La.App. 3rd Cir. 1967) for the proposition that such disclaimers should be recognized. We find these cases to be distinguishable from the instant case. Those cases involved purchasers aggrieved by the failure of the products to do what they were purchased to do. The respective disclaimers in those cases were clearly and expressly aimed at avoiding responsibility for such an eventuality. In the instant case, no complaint is made with respect to Dacthal's weed-killing effectiveness; the complaint is that it produced an effect it was warranted not to produce. Furthermore, in the Lovett case, the disclaimer specified the secondary or side effects, responsibility for which the manufacturer was seeking to avoid, viz, the effects of the pesticide on crops. In the instant case, the disclaimer fails to identify such secondary effects; we find that it does not expressly or fairly inform the purchaser of the nature or the scope of the potential liability sought to be avoided. Moreover, the interpretation urged by the defendants in this case would result in a direct conflict between the scope of the disclaimer and the representations that Dacthal was safe for use on azaleas, which characteristic or quality was admittedly the primary concern of the Casadabans. We do not find merit in the defendants' argument on this point.
The trial Judge's findings on the issue of proof of damages are reflected in the following portions of his reasons for Judgment:
"Several reviews of my notes of the several days of testimony and an examination of the transcript of the testimony failed to show where counsel for plaintiff had proved just what monetary damages the plaintiff suffered.
"The only evidence which the plaintiff presented to prove the number of plants lost or their market value was Mr. Casdaban's own testimony, as to his and Mr. Rester's guestimate (sic) of the number of plants that were not capable of being sold and the value which Mr. Casadaban placed upon each of the lost plants.
* * * * * *
"___ The plaintiff failed to bring forth any evidence as to sales and profits in any years preceding, or following, the year of the damage in question, nor did he produce any other corroberative evidence to prove that there was actually a pecuniary loss suffered by the nursery after the use of the herbicide.
* * * * * *
"Then defense counsel, in his brief, repeatedly hammers at the fact that plaintiff knew defendants were denying his claim against them, before he destroyed and removed the plants, and therefore he should have been on his guard to establish with certainty his damages. Had he done so, this Court could award to him some of the money he is seeking. This Court is distressed to find, frankly, that it cannot find evidence in the record to reach that kind of conclusion. This Court must therefore hold that the plaintiff's own estimate of approximate losses, unsubstantiated by detailed and corroborative evidence, which should have been produced at the trial, does not meet the requisite burden of proof.
"There is testimony in the record of approximately $8,323.00 of harvest cost which Mr. Casadaban contends he expended. This Court's appreciation of the *859 law is that in a case for a loss of a crop, it is correct to give a credit against the amount of the loss equal to the amount that would normally have had to be spent to harvest or produce the crop. Here, however, the Court has not been able to reach a determination as to the value of the "crop" itself, and it would appear proper that the credit not be applied.
"However, Mr. Casadaban did testify to additional expenditures in the amount of $11,424.00 made in order to bring his operation back into normal conditions after the removal of the damaged plants. The Court will award plaintiff a judgment in the amount of $11,424.00, plus those amounts in the record for his expert's preparation and testimony."
These were the conclusions of the trier of fact, who otherwise would have been disposed to award damages to the plaintiff.
While the absence of independent, corroborating evidence may not be fatal to the plaintiff's burden of proof, the lack of even a minimal degree of detail or specificity in his own testimony as to the extent of the loss precludes an award, even under the holding in Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (1971), relative to the degree of certainty required to support an award of monetary damages.
With respect to actual expenses incurred as a result of the damage, the only statements in the record to support the amount awarded were Mr. Casadaban's estimates that it took "six or seven months to straighten the place out," and his testimony that his weekly payroll at the time was $476.00. ($476.00 X 24 weeks = $11,424.00). Of this amount, the sum of $8,323.00 was explained in reasonably certain terms as representing the time required to dig up and dispose of the dead and damaged plants. (Although the trial judge stated that this represented the estimated harvest cost, and Mr. Casadaban so testified in response to a hypothetical question asked on this point at pages 454-456 of the Record, he also testified that the same costs were incurred in digging up and disposing of the plants, at page 470 of the Record). But beyond this figure, Mr. Casadaban's testimony is simply lacking in any quantitative description of the work done or of the hours, days or weeks required to do it.
Accordingly, the judgment of the Trial Court is amended to reduce the amount of the principal award from $11,424.00 to $8,323.00 and, as amended, is affirmed. The costs of this appeal is to be borne by plaintiff-appellants. All other costs in these proceedings are assessed against defendants-appellees.
Amended and affirmed.