580 So.2d 684 (1991)
HALE FARMS, INC., Plaintiff-Appellee,
v.
AMERICAN CYANAMID COMPANY and Goldman Grain Company, Inc., Defendants-Appellants.
No. 22397-CA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 1991.
Rehearing Denied June 13, 1991.
*686 Habans, Bologna & Carriere by William F. Bologna, for defendants-appellants.
Brent S. Gore, for plaintiff-appellee.
Before MARVIN, HIGHTOWER and BROWN, JJ.
MARVIN, Chief Judge.
In this action against the seller and manufacturer of the herbicide Scepter, which is sold and marketed to control pigweed in soybean fields, the defendants appeal a judgment which awarded damages and attorney fees under the redhibition articles of the Civil Code to the plaintiff, a farming corporation.
Defendants contend the product was not defective but was applied contrary to the label instructions. They also complain of the damage awards in several respects and contend attorney fees are not recoverable, arguing that plaintiff's claim is couched in products liability rather than redhibition.
Plaintiff, Hale Farms, argues in brief that the appeal was premature and the suspensive appeal bond was not timely filed. Hale did not file a motion to dismiss the appeal for lack of jurisdiction or other irregularities under CCP Arts. 2161-2162. We consider Hale's arguments only to the extent that they question our jurisdiction, finding them without merit for reasons we discuss below. The request for additional attorney fees on appeal, having been made only in brief and not by answer to the appeal, is not considered. CCP Art. 2133; Bank of Logansport v. Sewell, 467 So.2d 1217 (La.App. 2d Cir.1985).
We amend the judgment to reduce Hale's recovery to the damages associated with one of the four fields for which the trial court awarded damages, and to reduce correspondingly, the contingent attorney fee that was awarded.
We affirm the judgment, as amended.

TIMELINESS OF APPEAL
The trial court judgment was signed March 27, 1990. Defendants filed a timely motion for new trial that was heard and denied in open court on April 19, 1990. On April 27, defendants filed a "petition for appeal" that did not contain an order. On May 8, the trial court signed a judgment *687 denying the motion for new trial. On June 11, the court signed an order granting a suspensive appeal and setting bond at $1,500. Because the amount of the bond did not comply with CCP Art. 2124, the court signed another order of appeal on June 18, changing the amount of security to $96,686. The appeal bond was filed on July 9.
Hale contends the appeal was premature because the petition for appeal was filed before the judgment denying the motion for new trial was signed. The motion for new trial was not taken under advisement, and neither party requested notice of judgment on the motion. The appeal delay began when the motion for new trial was denied in open court. Boyd v. Fourchon, Inc., 408 So.2d 380 (La.App. 1st Cir.1981).
The petition for appeal was filed about a week after the motion for new trial was denied. Both orders of appeal were signed within 60 days of the denial of a new trial. We have jurisdiction of the appeal, at least as a devolutive appeal. CCP Art. 2087.
When the appeal can be maintained as devolutive, the timeliness of the filing of the appeal bond to perfect a suspensive appeal is not a jurisdictional matter and must be raised by a motion to dismiss the appeal filed within three days of the return date or lodging of the appeal. CCP Art. 2161; Gautreau v. Modern Finance Co., 358 So.2d 980 (La.App. 1st Cir.1978), writ denied; Peters v. Life General Sec. Ins. Co., 393 So.2d 1286 (La.App. 1st Cir.1980), writ denied.
Hale did not file a motion to dismiss the appeal. We need not consider whether the suspensive appeal bond was timely filed at this juncture. The appeal is before us if only as a devolutive appeal.

FACTS
Thomas Hale, president of the Hale corporation, planted seven fields of soybeans in Tensas Parish in May 1986. Before the fields were planted, they were treated with an herbicide to control pigweed. Field 1 was treated with Scepter, manufactured by defendant American Cyanamid Company. The other fields were treated with another company's product. These "preplant incorporation" (PPI) treatments controlled pigweed in Fields 1, 5 and 6 but did not control pigweed in the other four fields, 2, 3, 4, and 7.
After the fields were planted in May heavy rains persisted until mid-June. Hale replanted all fields in late Juneearly July. Hale saw, but planted through, pigweed in Fields 2, 3, 4 and 7, deliberately deciding to treat them "postemergence" with Scepter. The postemergence treatments did not eradicate the pigweed and Hale's yield from these fields was lower than his yield from the other fields.
Hale bought 40 gallons of Scepter for the postemergence treatment from three different sellers. It sued one seller, Goldman Grain Co., Inc., from whom it bought 12½ gallons, and the manufacturer, American Cyanamid, seeking $5,985 for the cost of the 40 gallons of Scepter, $54,591 in lost profits, $2,842 for the cost of treating the fields where the pigweed went to seed before the next season's planting, $50,000 for emotional distress, and reasonable attorney fees. The trial court denied the emotional distress damages because plaintiff is a corporation, but awarded, against American Cyanamid, the other items of damages in the amounts sought by Hale, plus attorney fees of $22,707. Goldman Grain was cast in solido with American Cyanamid only for $1,822, the price Hale proved it paid for the Scepter it bought from Goldman.
The trial court found that the Scepter Hale used in the postemergence treatments of Fields 2, 3, 4 and 7 had a redhibitory defect which caused the low crop yields. These findings were based in part on the fact that Hale had adequate yields from its other fields, which had been treated PPI either with Scepter (Field 1) or with another company's product (Fields 5 and 6), but had not been treated with Scepter postemergence, and in part on testimony of other farmers and expert witnesses that Scepter sometimes failed to control pigweed in commercial or test fields of soybeans.
Having concluded that Hale proved that a redhibitory defect in the product was the *688 cause of its damages, the court addressed, and rejected, defendants' contention that the product failed to control pigweed because Hale used it contrary to the label instructions. Defendants contended Hale acted contrary to the label instructions in three respects: applying Scepter when the pigweed was more than 12 inches high, using 10 instead of 20 gallons of water per acre to apply it, and using less Scepter per acre than the required or instructed rate of one gallon to 12 acres.
On conflicting testimony about the height of the pigweed, the court found the pigweed was not over 12 inches high when Hale applied Scepter. The court found that the label instructions regarding gallons of water were ambiguous and that Hale used a proper rate of Scepter per acre. Defendants contend these findings are clearly wrong, reiterating that Hale's low crop yields were not caused by a product defect, but by Hale's "off-label" use of the product.

PROOF OF DEFECT
The overlapping of products liability and redhibition law in an action by the purchaser of an allegedly defective product against the seller or the manufacturer has been noted. Philippe v. Browning Arms Co., 395 So.2d 310 (La.1981) (on rehearing). The definition of "defect" is similar, but not identical, in the two areas of law. We recognized this in Benoit v. Ryan Chevrolet, 428 So.2d 489 (La.App. 2d Cir.1982).
A redhibitory defect is one which renders a thing unfit for its intended use. A defect under pre-1988 products liability law is one which renders the product unreasonably dangerous to normal use.[1]Benoit, supra. Normal use includes all intended uses, as well as all reasonably foreseeable uses and misuses of the product. Bloxom v. Bloxom, 512 So.2d 839 (La.1987).
In Benoit, we found that the overspinning of an automobile tire was a foreseeable, and therefore normal, use under tort law, but was not an intended use under redhibition law. Defendants do not dispute that Hale's use of Scepter to control pigweed was an intended use of the product. They argue that his "off-label" application was not a reasonably foreseeable misuse under products liability law.
Under the circumstances of this record, the products liability definition of "defect" and burden of proof applies to Hale's claim to allow us to determine whether Hale's admitted "off-label" (mis)use was reasonably foreseeable. Notwithstanding this application, we apply redhibition principles to the "intended" use of Scepter on Field 7. See section on damages, infra.
The plaintiff in a products liability action has the burden of proving that the product was defective, or unreasonably dangerous to normal use, and that the defect caused his injury or damage. Weber v. Fidelity & Casualty Insurance Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971). Normal use includes use in accordance with the manufacturer's instructions, as well as reasonably foreseeable misuse that is contrary to the manufacturer's instructions. Bloxom v. Bloxom, supra; Whitacre v. Halo Optical Products, Inc., 501 So.2d 994 (La.App. 2d Cir.1987). Proof of compliance with, or a reasonably foreseeable deviation from, the Scepter label instructions is thus a critical part of Hale's burden of proof under Weber and its progeny.

LABEL INSTRUCTIONS
Hale read the booklet containing these instructions before he had Scepter applied postemergence:

GROUND APPLICATIONS
Uniformly apply with properly calibrated ground equipment in 10 or more gallons of water per acre. Use sprayers equipped with nozzles that provide accurate and uniform application. To minimize *689 drift, use a maximum spray pressure of 40 psi.
To ensure thorough coverage, use a minimum of 20 gallons of water per acre when applying SCEPTER to minimum or no-till soybeans or when applying as a postemergence treatment. Use higher gallonage for fields with dense vegetation or heavy crop residues.
USE RATES
Apply SCEPTER at a broadcast rate of 2/3 pint per acre for all methods of applicationpreplant incorporated, preemergence (including minimum and no-till systems) and postemergence. At this broadcast rate, one gallon of SCEPTER will treat 12 acres of soybeans.
POSTEMERGENCE APPLICATIONS
Apply SCEPTER as a postemergence treatment after crop emergence but before weeds exceed a height of 12 inches. Apply at a broadcast rate of 2/3 pint per acre. Apply when weeds are actively growing.
SEQUENTIAL PROGRAM
Apply SCEPTER at 2/3 pint per acre as a sequential postemergence treatment following either a preplant incorporated or a preemergence treatment of SCEPTER at 2/3 pint per acre ... to control certain problem weeds [not including pigweed].
Hale used 10 rather than 20 gallons of water per acre in each of the postemergence applications. He used a rate of one gallon of Scepter to 12 acres in Field 7 and one gallon to 30 acres in Fields 2, 3 and 4. When the pigweed kept growing in Fields 2-4, Hale reapplied Scepter at the rate of one gallon to 15 acres in Fields 2 and 3 and one gallon to 12 acres in Field 4, again using 10 instead of 20 gallons of water per acre in each application.
Hale's postemergence applications were made after he replanted the fields because of the heavy rains that followed the original planting. Fields 2-4 were replanted on June 21, 1986 and were first treated with Scepter on June 25 (Fields 2 and 3) and June 26 (Field 4). Fields 2 and 3 were resprayed with Scepter on July 8. Field 4 was resprayed on July 14. Field 7 was replanted on July 7 and was sprayed with Scepter only once, on July 9-10.

WEED HEIGHT
Hale testified that the pigweed was less than four inches high when Scepter was applied postemergence and that none of the pigweed was more than 12 inches high when the second application to Fields 2, 3 and 4 was made.
Hale's neighbor, Delton Keyes, who also had a pigweed problem in 1986, sprayed his own fields with Scepter on July 14, the date of Hale's last application, and said his and Hale's pigweeds were about the same height, between four and eight inches, with none exceeding 12 inches.
Terry Guillory, the manager of a local farming co-op, visited Hale's farm twice in 1986. According to Guillory, the highest pigweed was six to eight inches when Hale began replanting his fields on June 21 and was 12-14 inches between Hale's first and second applications of Scepter. Guillory said most of the pigweed was under 12 inches on his second visit.
Mike Henley, an American Cyanamid sales representative, testified the pigweed was between six and 30 inches tall when he visited Hale's farm on July 22, about a week after Hale's last application of Scepter. Hale claimed Henley's visit was on August 5, several weeks after the last Scepter application.
The trial court found that the pigweed was not over 12 inches high when Hale applied Scepter. We do not disturb a factual finding based on the trial court's assessment of witness credibility. Rosell v. ESCO, 549 So.2d 840 (La.1989).

VOLUME OF WATER
Several witnesses, lay and expert, were questioned about the number of gallons of water per acre required by the label instructions for Hale's postemergence applications. See GROUND APPLICATIONS section of instructions, quoted *690 above. Some witnesses concluded the instructions clearly require 20 gallons per acre for postemergence applications. Others reasoned Hale's use of 10 gallons per acre complied with the paragraph requiring "10 or more gallons of water per acre."
Hale said he "didn't notice the twenty gallons for postemergence treatment" before he applied Scepter. When asked to interpret that part of the instructions at trial, he said:
What it says is, that you use a minimum of twenty gallons if ... you're not sure of your coverage. If you want to make sure you get good coverage, use the twenty gallons.... But I got good coverage on the ten gallons.... If you can get good coverage with ten gallons, why use twenty? ... See, it says in that first paragraph, ten or more; ten or more.
The trial court found that the instructions were ambiguous because they called for 10 gallons of water in one paragraph and 20 in another, and "the parameters of when to use either are not sufficiently delineated to give confidence in either choice." The court also found:
... if American Cyanamid knew that application of Scepter with only ten gallons of water would prevent the product's performing, they should have been more explicit in informing the user as to correct product use. This is especially true where expert evidence established that "most farmers work in the ten gallon range" and research had been carried out establishing that the product performed the same within a wide range of water gallonage as long as the water used adequately carried the Scepter onto the field.
Defendants contend the instructions are not ambiguous when the two paragraphs on ground application are read together.
Assuming for discussion purposes only, and without finding, that the instructions are not ambiguous, we review the evidence in this respect to determine whether Hale's use of 10 gallons of water per acre was a reasonably foreseeable misuse of Scepter, the implied finding of the trial court.
Hale presented expert testimony from a weed scientist, Dr. Ford Baldwin, and an agricultural engineer, Dr. Dennis Gardisser, both employed by the University of Arkansas Extension Service in Little Rock. Both testified about the results of a study they performed in 1985-1986 to evaluate the effectiveness of postemergence herbicide application methods and equipment used for weed control in soybeans. Scepter was one of the four herbicides studied. Scepter was available for emergency use in 1985 and was fully licensed for distribution in March 1986.
Drs. Baldwin and Gardisser applied some Scepter in five gallons of water per acre and some in ten gallons per acre in their study. We emphasize their findings:
The results of this study indicate there is no significant difference in weed control due to herbicide application equipment type or spray volume when recommended rates of chemicals are applied.

Dr. Baldwin testified that the same conclusion had been reached in all other studies of which he was aware, explaining that he uses ten gallons of water per acre or less in all of his research work. Conceding that 20 gallons of water per acre will theoretically give better coverage than 10, he opined that
a lot of water doesn't ensure thorough spray coverage, what ensures thorough spray coverage is the droplet relationship, and your nozzle pressure relationships and that type of thing.... Most farmers will be using less than twenty gallons of water, and I would say that the average would probably be in the ten-gallon range. When we deal with farmers on water volume, we tell them... that how you spray a given volume of water is more important than the volume itself.
Dr. Walter Congleton, the product claims manager for American Cyanamid, did not recall having read Dr. Baldwin's studies but said:
I am familiar with some of his research indicating that ten gallons may perform adequately in some cases, but that does not comply with our label and our experience *691 has been that for consistent performance that we back up, twenty gallons is what we recommend.... if the label were followed [in other respects], and you used ten gallons of water per acre, it could possibly give effective control of pigweed. But we do not claim that it will give consistent control.
The deposition of Dr. Dearl Sanders, a weed scientist with the Louisiana Cooperative Extension Service, originally taken by Hale, was offered in evidence by defendants. Dr. Sanders testified that the Scepter label instructions require a minimum of 20 gallons of water per acre for postemergence applications but said he has used "anywhere from 10 to 20 gallons" per acre in studies involving Scepter and that "the amount of water used has not been that closely related to coverage in that volume range." When asked if he would expect Hale's use of more water to have affected Scepter's performance, he said, "No, not if he got good coverage [with 10 gallons]." Hale, of course, said that he did get good coverage with 10 gallons per acre.
The trial court could reasonably find or infer from the evidence that Hale's use of 10 gallons of water per acre was a reasonably foreseeable (mis)use of the product. We shall not disturb this finding. Rosell v. ESCO, supra.

RATE OF SCEPTER PER ACRE
Three sections of the label instructions state the per acre rate of Scepter required for postemergence applications. See USE RATES, POSTEMERGENCE APPLICATIONS and SEQUENTIAL PROGRAM sections, quoted above. Each instruction is consistent with the others. The user is clearly instructed to apply Scepter at the rate of one gallon to 12 acres for postemergence application. Hale applied it at the instructed rate only to Field 7. He used a rate of one gallon to 30 acres, less than half the label rate strength, in his initial applications to Fields 2, 3 and 4. Almost two weeks later, he reapplied Scepter to Fields 2 and 3 at the rate of 1:15. Field 4 was resprayed at the label rate of 1:12 about 2½ weeks after the initial application.
Hale clearly complied with the label instructions as to Field 7. Hale maintained, and the trial court found, that he also complied with the instructions as to Fields 2, 3 and 4, notwithstanding that his initial application rate was off-label. The trial court reasoned that the cumulative amounts of Scepter Hale used in the first and second applications to these fields equaled a rate of 1:10 for Fields 2 and 3 (1:30 + 1:15, or 2:30), and 1:8.6 for Field 4 (1:30, or 2:60 + 1:12, or 5:60), both exceeding the 1:12 label rate.
The trial court also found that Hale's sequential use was foreseeable because the label instructions describe a sequential program for postemergence application. Apparently understanding that the sequential program did not squarely apply to Hale because it does not warrant control of pigweed and it speaks of "a sequential postemergence treatment following either a preplant incorporated or a preemergence treatment of SCEPTER," which Hale did not make in Fields 2, 3 and 4, the trial court reasoned:
As the label describes a sequential use program in other similar circumstances, it could be anticipated that the product would be sequentially used as Hale Farms did, and if that use would prevent proper product performance, American Cyanamid needed to explicitly inform the user of the limitations of a sequential use... especially ... given the positive results of University sponsored research with less than label amounts of Scepter, the dissemination of the results of that research, and [the] farmer's eagerness to save money.
At this juncture we refer to expert testimony in this record.
Dr. Baldwin described his research with reduced rates of Scepter:
We've done an awful lot of research on reduced rates at the University of Arkansas, primarily from an economic standpoint.... Scepter ... is not a very rate responsive herbicide. If the activity is good it normally has good activity within *692 reason across a range of rates, and if there are some conditions, either weed size or environmental conditions, where it doesn't necessarily have good activity, then it normally doesn't have good activity across the range of rates.... [Our emphasis.]
Q. [On cross-examination] If I understand what your testimony was in the earlier part of the questioning, most of your research has been done in off-label applications of Scepter, is that correct?
A. No, that's not correct at all. I would say most of my research, if you had to take a percentage of treatments, ... has been done with on-label applications. It's just in a lot of cases we do compare some less than label rates to those label rates, but I would say by far the bulk of it would have been with on-label rates for Scepter.
We reproduce several sections of the 1985-1986 study of Drs. Baldwin and Gardisser which mention the correlation between off-label rates of Scepter and other herbicides, and crop yields:
SUMMARY: ... Several types and rates of chemicals were used. No significant differences were noted in equipment performance... with the exception of the air-assist directed spray unit which had very poor results. All units lost control about equally as rates of chemical were reduced.

INTRODUCTION: ... The results of this study indicate there is no significant difference in weed control due to herbicide application equipment type or spray volume when recommended rates of chemical are applied. [Our emphasis.]
DISCUSSION OF METHODS USED:... In the variable rate study, reducing rates tended to reduce yields with all the application methods (Table 8). The 1/4X rate also yielded significantly less than the weed-free check [plot].
REMARKS: ... A definite trend toward lower yields was noted with lower chemical rates.
Neither Dr. Baldwin's testimony nor the study results reasonably support the trial court's conclusion that there were "positive results of University sponsored research with less than label amounts of Scepter."
Dr. Baldwin read from an article he wrote for the December 1986 issue of Soybean Digest:
Scepter provides a much broader spectrum of control as a pre-plant or ppi treatment than as a post treatment.... But it's more consistent on cocklebur as a post treatment and active at lower rates. We can go down to ½ and even ¼ of the label rate in our work, and if we have actively growing cocklebur, we'll still get control ... Under active growing conditions, it has been good on pigweed, but failed under the drought conditions of this year on Palmer pigweed in Arkansas studies.
Hale's soybean fields grew a species of pigweed called tall water hemp. He did not have Palmer pigweed or cocklebur. The Scepter label warrants that it will control cocklebur and five species of pigweed, including Palmer and tall water hemp, when applied as directed. Dr. Baldwin has not tested Scepter on tall water hemp pigweed but said this weed's susceptibility to Scepter is equal to that of other species of pigweed according to the data he has seen.
Dr. Baldwin testified that there was good weather in Arkansas at the beginning of May, followed by daily rainfall from mid-May to mid-June, and no rain for the rest of the summer. He said Scepter "worked well pretty much across the board early in the season ... when moisture was good." His findings that Scepter failed to control pigweed regardless of the rate used were based on plantings "from the middle of June on." He was not squarely asked whether he considered the failure to be due to a product defect. His testimony, taken as a whole, appears to attribute the failure to 1986 weather conditions in Arkansas, which were apparently similar to those in Tensas Parish, where Hale farms.
Three other Tensas Parish farmers testified about their use of Scepter in soybean fields in 1986. One said it failed to control cocklebur at the rate of one gallon to 12 acres but said he made no postemergence *693 applications. Another "got good results" from postemergence applications to pigweed at the rate of 1:12. The third, who used Scepter postemergence in July 1986 at the rate of 1:12, said the product failed to control pigweed.
The Scepter label instructions warn that "crop injury, ineffectiveness or other unintended consequences may result because of such factors as weather conditions ... or the use or application of the product contrary to label instructions, all of which are beyond the control of American Cyanamid Company." The instructions for postemergence application state, "DO NOT apply SCEPTER postemergence when soybeans and weeds have been subjected to stress conditions such as temperature and moisture extremes."
Hale made the initial postemergence applications of Scepter to Fields 2, 3 and 4 in late June, 1986. He used the rate of 1:30 on the advice of Terry Guillory, a local farm supply store manager. He said Guillory told him he "could probably kill it one to thirty if it was smooth leaf pigweed." Hale admitted that neither he nor Guillory knew what type of pigweed he had, but said, "we only have one in that area and... the Experiment Station usually says it's smooth leaf." The Scepter label warrants that it will control smooth leaf pigweed when applied as directed.
Hale was questioned on cross-examination about his successive applications to Fields 2, 3 and 4:
Q. The [label] says nothing about using one to thirty or one to fifteen. It says one to twelve, doesn't it, sir?
A.... It doesn't say that I can't put it out in two applications.
Q. Well, sir, you know, don't you, that you can't put it out in two applications because it doesn't average out when you wait a week between applications. You know that, don't you?
A. No. There's other chemicals that you do the same way.
Q. Well, but you know that this one doesn't because this doesn't say it does, does it?
A. It doesn't say that you can't do it [in two applications] ... if you get it one to twelve or better.
Guillory admitted the 1:30 rate is not on the Scepter label. He said "we came back with a second dose" when the first application did not control the pigweed. Hale's counsel then asked him, "If the second dose is sufficient to meet the label requirements, then you met the label requirements, is that right?" Guillory did not explicitly agree, saying, "We would come back with the additional dose to try to kill the weeds."
Mike Henley, the American Cyanamid sales representative, testified: "The broadcast rate is one gallon to twelve acres or two-thirds pints per acre. That's the label rate.... Anything other than [that] is completely off label." On cross-examination, he agreed that the label "does not say that you can't put that out in two applications," adding, "but it does say that the application must be ... at one gallon to twelve acres."
Defendants' expert, Dr. Congleton, testified that Hale's cumulative applications were "mathematically" equal to rates exceeding the label rate but said industry convention dictates, and the label instructions imply, that the 1:12 rate is to be used in a single application except as noted in the SEQUENTIAL PROGRAM section, which warrants control of only three weeds, not including any species of pigweed.
Without disturbing the trial court's election to credit the testimony of Hale and his witnesses, particularly Dr. Baldwin and Terry Guillory, we must find the evidence legally insufficient to satisfy Hale's burden of proving that the rates of Scepter used on Fields 2, 3 and 4 constituted reasonably foreseeable misuses of the product. When the issue is sufficiency of the evidence that was credited by the trial court, rather than whether the court should have believed one witness over another, the constraints of Rosell v. ESCO, supra, do not apply. See and compare Cole v. Joshua, 575 So.2d 859 (La.App. 2d Cir.1991) and Cucinella v. *694 Peninsular Fire Insurance Co., 324 So.2d 616 (La.App. 1st Cir.1975), writ denied.
Proof that a product failed to perform does not, of itself, prove that a product defect caused the plaintiff's damage. The plaintiff must also prove that the failure occurred during "normal use" of the product, which includes reasonably foreseeable misuse, as defined in Bloxom and Whitacre, both cited supra. Compare Weber, supra, and Casadaban v. Bel Chemical & Supply Co., Inc., 322 So.2d 854 (La.App. 1st Cir.1975), where products were applied according to the manufacturer's instructions and were found to be defective, with Potmesil v. E.I. DuPont deNemours Co., Inc., 408 So.2d 315 (La.App. 3d Cir.1981), writ denied.
Potmesil, a farmer, applied an herbicide in twice the amount specified in the label instructions. The trial court found the instructions confusing and held the manufacturer liable for failing to warn of the consequences of overapplication. The court of appeal reversed, noting that Potmesil candidly admitted he had not read the instructions before applying the product, that he had no trouble understanding them when he later read them, and that he was aware of the consequences of improperly applying an herbicide.
The Scepter label instructions clearly and consistently specify a broadcast rate of one gallon of Scepter to 12 acres for all postemergence applications. Hale's contention that cumulative applications, made about two weeks apart and at an initial rate of less than half the label rate, satisfied the 1:12-acre label requirements "because it doesn't say that I can't put it out in two applications," cannot be found a reasonably foreseeable misuse of Scepter.
Hale did not prove that he complied with, or reasonably deviated from, the Scepter label instructions in his applications to Fields 2, 3 and 4. The record does not support the trial court's finding that the low crop yields from Fields 2, 3 and 4 were caused by a product defect. We shall amend the judgment to limit Hale's recovery to the damages attributable to Field 7, the only field for which he proved "normal use" of the product.

DAMAGES
The trial court cast American Cyanamid for over $63,000 in damages for the return of the purchase price of 40 gallons of Scepter, lost profits from Fields 2, 3, 4 and 7, and the cost of treating those fields with another chemical to control pigweed before the next season's planting. CC Art. 2545. Goldman Grain, as a good faith seller under CC Art. 2531, was cast only for the cost of the 12½ gallons of Scepter it sold to Hale.
Hale treated Field 7 with five gallons of Scepter that it bought from Goldman Grain for $729. Its lost profits from Field 7 totaled $3,399. It spent $323.95 to treat Field 7 before replanting. Its damages for Field 7 total $4,552.95.
American Cyanamid contends Hale cannot recover lost profits because the disclaimer in the Scepter instruction booklet states:
American Cyanamid Company warrants only that the material contained herein conforms to the chemical description on the label and is reasonably fit for the use therein described when used in accordance with the directions for use, subject to the risks referred to above.
Any damages arising from breach of this warranty shall be limited to direct damages and shall not include consequential commercial damages such as loss of profits or values or any other special or indirect damages.
A manufacturer's warranty limitation provisions in documents such as car owner's manuals that are delivered to the buyer without calling attention to, and obtaining the buyer's express consent to, the limitations, have been held to be unenforceable. Media Pro. Consult., Inc. v. Mercedes-Benz of N.A., Inc., 262 So.2d 377 (La.1972); Bendana v. Mossy Motors, Inc., 347 So.2d 946 (La.App. 4th Cir.1977). Compare, however, California Chemical Company v. Lovett, 204 So.2d 633 (La.App. 3d Cir.1967), where a waiver of warranty in *695 the consignment agreement signed by the buyer and the seller was enforced.
There is no evidence in this record that Hale consented to the limitation of liability in the Scepter instruction booklet. We find Hale is legally entitled to recover Field 7 lost profits under CC Art. 2545.
Alternatively, American Cyanamid contends Hale's lost profits should be measured by comparing its 1986 crop yield with the average soybean yield for Tensas Parish in 1986 (17.9 bushels per acre), and not to the yield of Hale's "check fields," which the trial court used as the measure of damages. Field 1, the check field for Fields 2, 3 and 4, yielded 29.5 bushels per acre. Field 5, the check field for Field 7, yielded 19.5 bushels per acre, or 12 bushels per acre more than Field 7, which yielded 7.5 bushels per acre.
American Cyanamid's product claims manager, Dr. Congleton, opined that Field 5 was "a valid check for [all four] fields where the pigweed was not eliminated." We find the record clearly supports the trial court's measure of lost profits on Field 7. See and compare Jardell v. Sabine Irrigation Co., Inc., 346 So.2d 1365 (La.App. 3d Cir.1977).
We cannot agree with American Cyanamid's argument that the awards for lost profits and return of the purchase price amount to "double recovery" because Hale cannot return the product and the lost profit award "has the effect of providing [Hale] his entire out-of-pocket loss as if the product did work." Recovery of lost profits in addition to the return of the purchase price is clearly allowed against the manufacturer. CC Art. 2545; Radalec, Incorporated v. Automatic Firing Corp., 81 So.2d 830 (La.1955).

ATTORNEY FEES
American Cyanamid contends that Hale may not recover attorney fees because this is a products liability case and not a redhibition case, asserting that Hale did not allege any facts to put American Cyanamid on notice of any redhibition demands and did not seek to rescind the sale or offer to return the product.
The buyer's obligation to tender the product for repair or correction applies only to a good faith seller and not to a manufacturer. Benard v. Bradley Automotive, 365 So.2d 1382 (La.App. 2d Cir.1978). Tender is not required when it is impossible, as it was here after Hale sprayed the Scepter in his fields. Alan Randal Company v. Quality Oil Company, 100 So.2d 282 (La.App. 1st Cir.1958).
Hale's petition claimed the purchase price of Scepter as one element of damages and sought damages for emotional distress and attorney fees. These demands gave defendants "fair notice" of Hale's redhibition claim, notwithstanding that Hale did not expressly seek rescission of the sale or use the word redhibition. Townsend v. Cleve Heyl Chevrolet-Buick, Inc., 318 So.2d 618 (La.App. 2d Cir.1975).
Hale's claim suggests elements of both tort and redhibition. The right and extent of Hale's recovery against American Cyanamid is governed by the interplay of CC Arts. 2315 and 2545 and includes the right to reasonable attorney fees. Philippe v. Browning Arms Co., supra; Albritton v. McDonald, 363 So.2d 925 (La. App. 2d Cir.1978), writ denied.
In summary, Hale's application of the product with 10 or more gallons of water on the soybean fields other than Field 7 is deemed to be an intended use for the purposes of redhibition. His application in that respect, however, in either more or less than one gallon to 12 acres cannot be deemed to be an intended use. His application to Field 7, however, in the ratio of one gallon to 12 acres is deemed to be an intended use to allow his recovery of damages under redhibition.
Hale claimed attorney fees in the amount of 1/3 of his damages under a contingency fee contract. The trial court awarded attorney fees of $22,707.52, consisting of $21,139.77 as the 1/3 contingency fee and $1,567.75 for costs advanced. American Cyanamid does not complain of the 1/3 contingent fee. We reduce the award to *696 $1,516.13, which is 1/3 of the reduced damage award that totals $4,552.95. Lafleur v. John Deere Co., 491 So.2d 624 (La. 1986). We do not include the advance costs in the attorney fee award because the judgment casting American Cyanamid for "all costs" would include the costs advanced by Hale's attorney.

DECREE
We amend the judgment to reduce the amount of Goldman Grain's liability to $729 and to reduce American Cyanamid's liability to $4,552.95 in damages and $1,516.13 in attorney fees. We cast Hale with cost of the appeal and otherwise affirm. The judgment, as AMENDED, is AFFIRMED.
HIGHTOWER, J., concurs and assigns written reasons.
HIGHTOWER, Judge, concurring.
I concur. However, failing to view Hale's utilization of only ten gallons of water per acre as an "intended use" (although admittedly a reasonably foreseeable misuse), I would not allow recovery of the purchase price and attorney's fees under redhibition provisions.

APPLICATION FOR REHEARING
Before MARVIN, HIGHTOWER, VICTORY, BROWN and STEWART, JJ.
Rehearing denied.
NOTES
[1] The Louisiana Products Liability Act, LRS 9:2800.51 et seq., uses the term "reasonably anticipated use" rather than "normal use." It took effect in 1988, after Hale's claim arose. It does not apply retroactively. McCoy v. Otis Elevator Co., Inc., 546 So.2d 229 (La.App. 2d Cir.1989), writ denied.