SUSAN M. CHEHARDY, Chief Judge.
lain this case, the purchaser filed suit against the seller and the manufacturer of *364 commercial air handler units alleging that the units were defective and seeking rescission of the sale. In two separate proceedings, the trial court found that the air handler units contained a redhibitory defect, rescinded the sale, and awarded the purchaser a refund of the purchase price, plus interest from the date of the sale, damages, costs, and attorneys’ fees. The manufacturer appeals the judgments. For the following reasons, we amend the judgment and affirm as amended.

Facts

Live Oak Homes Corporation (“Live Oak”) is a maintenance and construction contractor for several residential apartment complexes. On December 7, 2006, Live Oak purchased 416 Air Handler Units (“units”), which had been manufactured by Multiaqua, Inc. (“Multiaqua”), from Carrier Sales and Distribution, L.L.C. (“Carrier”). The total purchase price of the units was $117,242.38.
In 2007, Live Oak installed 172 of the units in three apartment complexes located in the metropolitan New Orleans area. When the weather turned cold in Ríate 2007, tenants in 23 apartments reported that the units would not heat their apartments. Live Oak reported the problem to Carrier then to Multiaqua.
Live Oak hired two independent heating and cooling equipment specialists to investigate the problem. One specialist reported that the units were not operating properly as heaters because excessive radiant heat inside of the units was “overheating” the thermal overload device.[1] The second specialist further explained that the manufacturer’s “design of the heat strip does not put enough of the strip itself in the fan airflow path,” which “is causing the heat chamber to overheat (above 220 degrees) and the heater to fail on thermal disc or overload safeties.” In essence, the manufacturer’s configuration of the heating element inside of the unit, which placed the heating element, or “heat strip,” partially outside of the direct air flow, generated high temperatures, which triggered the device’s safety mechanisms to shut off the unit.
On April 29, 2008, Live Oak made formal demand upon Carrier and Multiaqua to return the purchase price and the cost of installation and removal of the installed units. Neither Carrier nor Multiaqua complied with the demand.[2]
On June 4, 2008,. Live Oak filed suit against Carrier, as the seller, and Multia-qua, as the manufacturer, alleging that the air handler units had a redhibitory defect. Carrier answered, denying the allegations of the petition and filed a cross-claim against the manufacturer, Multiaqua.
Multiaqua answered denying the allegations of the petition and raising the defense that the units that were installed failed due to an “incompatibility with the | ¿ventilation and electrical systems” extant in the buildings where Live Oak installed the units.
On January 10, 2012, Live Oak moved for partial summary judgment on the basis that the air handlers at issue were “not fit for their intended purpose.” Live Oak attached to its motion for summary judgment, an affidavit and excerpts from the deposition of its employee, Joey Baldassa- *365 ro; the report from a mechanical engineer, Robert Wilson, regarding the ductwork and equipment; reports from two heating and air conditioning system consultants; the Service Bulletin issued by Multiaqua regarding excessive heat buildup inside the units; the report from an electrical engineer, Michael Smith, regarding the standard voltage delivered by Entergy; a report issued by Entergy on Power Quality Standards for Electric Service; photographs of face plate data and the heating coil apparatus of the units in question and a competitor’s unit; and an affidavit from Raul Mena regarding the remediation attempt on the air handlers in April of 2008.
On March 7, 2012, Carrier filed its opposition to Live Oak’s motion for partial summary judgment on the basis that it had supplied equipment that matched the specifications provided by Live Oak. To its opposition, Carrier attached an affidavit from its employee, Mike Judge; a copy of the equipment quotation made by Carrier to Live Oak through its agent, Joey Bal-dassaro; and the entire deposition of Joey Baldassaro as well as copies of his licenses and certifications.
On March 12, 2012, Multiaqua filed its opposition to Live Oak’s motion for partial summary judgment on the basis that there existed a genuine issue of material fact as to whether the air handlers contained a design defect. To its opposition, Multia-qua attached an affidavit from its principal, Ralph Feria and an excerpt from Joey Baldassaro’s deposition.
|ROn October 18, 2012, the trial judge heard the motion for partial summary judgment and took the matter under advisement. The next day, the trial judge granted partial summary judgment in favor of Live Oak, finding that “Live Oak has established as a matter of law that the overheating of the units was due to a redhibitory defect.”[3] Within 60 days of the judgment, Multiaqua filed its motion for devolutive appeal of the summary judgment, which was granted.
On November 26, 2012, trial of the quantum of damages commenced. At the beginning of trial, the parties stipulated that Live Oak purchased the air handler units in question through Carrier for $117,242.33 and Multiaqua is the “defacto manufacturer” of those units. After hearing two days of testimony and evidence, the trial judge took the matter under advisement.
On February 27, 2013, the trial judge rendered judgment in favor of Live Oak, against Multiaqua and Carrier for $216,099.65, plus “interest on the purchase price of $117,242.33 from the date(s) purchase price was paid.” Further, the trial judge awarded attorneys’ fees to Live Oak from Multiaqua of $65,575.88, “plus actual attorneys’ fees for preparation and filing of the post-trial brief and financial reconciliation.” In her written reasons for judgment, the trial judge stated:
[Pjursuant to the Civil Code’s articles on redhibition, Live Oak is entitled to: return of the $117,242.33 purchase price with interest from the time it was paid, reimbursement for reasonable expenses occasioned by the sale, reimbursement for expenses incurred for the preservation of the units, actual damages, and reasonable attorney fees, less any credits for Live Oak’s use of the units and for diminution in the value of the units owing to Live Oak’s failure to act as a prudent administrator.
*366 Specifically, besides the purchase price •with interest, the trial judge awarded:
■ Labor to remove and replace 172 Multiaqua units.$77,197.50 Miscellaneous expenses including expert fees, rental conces-
■ sions, | (¡repair service calls, and space heaters for tenants .. $10,305.41
■ Testing of units to prove defect.$15,479.11
■ Reimbursement for storage of 410 units.$8,585.00
$111,567.02
The total award to Live Oak of $228,809.35 was subject to a credit in favor of Multia-qua of $12,709.70 for Live Oak’s use of the units; thus, the award of $216,099.65, plus interest from the date(s) of purchase and attorneys’ fees.
On March 13, 2013, after the initial judgment was rendered, Carrier moved for a new trial or amendment of the judgment to assert its claim for attorneys’ fees of $26,328.16, pursuant to the parties’ stipulation at trial. That same day, the trial judge rendered an amended judgment, including the previous judgment and adding judgment in favor of Carrier against Mul-tiaqua in the stipulated amount for attorneys’ fees.
On April 8, 2013, Multiaqua filed a sus-pensive appeal, which was granted that same day. On April 9, 2013, the trial judge issued a “supplemental judgment” against Multiaqua, awarding Live Oak the additional sum of $5,512.50 for “legal fees for preparation and filing of post-trial brief and financial reconciliation.”[4]
On appeal, Multiaqua raises seven assignments of error challenging the finding of liability and the award of damages. Multiaqua specifically argues: first, the trial court erred in determining the air handler units had a redhibitory defect; second, the trial court erred in not finding that Live Oak suffered a diminution of the warranty due to failure to allow Multiaqua the opportunity to make the required repairs; third, the trial court erred in not finding that Live Oak failed to care for the air handler units as a prudent administrator; fourth, the trial court erred in not awarding Live Oak a reduction in price in proportion to Live Oak’s interest, pursuant to La. C.C. art. 2538; fifth, the trial court erred in awarding Live Oak the |7sum of $77,197.50 for labor to remove and replace the 172 Multiaqua units; sixth, the trial court erred in awarding Live Oak the sum of $15,479.11 for unit testing prior to the Court’s finding of a redhibitory defect; and, finally, the trial court erred in awarding $8,585.00 for the equitable amount of reimbursement for storing the units in two of Live Oaks vacant apartment units and unused storage containers.
DISCUSSION

PRELIMINARY NOTE

At this point, we must note a clerical error in the judgment granting Live Oak’s motion for partial summary judgment. That judgment is dated October 19, 2010, which is clearly a clerical error for several reasons. First, the judgment itself refers to the hearing that occurred on October 18, 2012. Further, the Notice of Judgment from the Clerk of Court indicates that the judgment was signed and issued on October 19, 2012 and mailed to the parties on October 22, 2012.
*367 The trial court could have corrected this error on its own initiative pursuant to La. C.C.P. art. 1951. Further, this Court may correct clerical errors in the judgment of a trial court. Frazier v. Carl E. Woodward, Inc., 378 So.2d 209 (La.App. 4 Cir.1979). Accordingly, we amend the judgment to reflect the date of the judgment to October 19, 2012. See, Moss v. Moss, 05-455 (La.App. 3 Cir. 11/2/05), 916 So.2d 455, 458.

REDHIBITION

In its first assignment of error, Multia-qua argues that the trial court erred in granting summary judgment, finding that the air handler units had a redhibitory defect. Multiaqua specifically contends that the trial judge erred in finding that “regardless of which of the two mechanisms caused the malfunction, the units nonetheless contained a redhibitory defect.”
IsSummary judgment will be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). The party bringing the motion bears the burden of proof; however, where the moving party will not bear the burden of proof at trial, the moving party must only point out that there is an absence of factual support for one or more elements essential to the adverse party’s claim. La. C.C.P. art. 966(C)(2); Babin v. Winn-Dixie Louisiana, Inc., 00-0078 (La.6/30/00), 764 So.2d 37, 38-41.
On appeal, our review of summary judgments is de novo under the same criteria that govern the district court’s consideration of whether summary judgment is appropriate. Pizani v. Progressive Ins. Co., 98-225 (La.App. 5 Cir. 9/16/98), 719 So.2d 1086, 1087. The decision as to the propriety of a grant of a motion for summary judgment must be made with reference to the substantive law applicable to the case. Muller v. Carrier Corp., 07-770 (La.App. 5 Cir. 4/15/08), 984 So.2d 883, 885.
In Louisiana, the seller warrants the buyer against redhibitory defects, or vices, in the thing sold. La. C.C. art. 2520 further provides:
A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale. A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price.
| n“The warranty against redhibitory defects covers only defects that exist at the time of delivery.” La. C.C. art. 2530; Aucoin v. Southern Quality Homes, LLC, 07-1014 (La.2/26/08), 984 So.2d 685, 691.
The extent of a seller’s liability to a buyer for breaching this warranty depends on whether the seller knew, or did not know, of the defect. See La. C.C. arts. 2531 and 2545. With regard to a seller who knew of the defect, La. C.C. art. 2545 provides as follows:
A seller who ... declares that the thing has a quality that he knows it does not have, is hable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the *368 preservation of the thing, and also for damages and reasonable attorney fees. If the use made of the thing, or the fruits it might have yielded, were of some value to the buyer, such a seller may be allowed credit for such use or fruits.
A seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing.
A manufacturer is conclusively presumed to have knowledge of defects in the object it manufactures. Id.; Young v. Ford Motor Co., Inc., 595 So.2d 1123, 1126 (La.1992). Because of this presumption, the manufacturer “is deemed to be in bad faith in selling a defective product” and is liable to the buyer for all damages recoverable under La. C.C. art. 2545. Pratt v. Himel Marine, Inc., 01-1832 (La.App. 1 Cir. 6/21/02), 823 So.2d 394, 404, writs denied, 02-2128, 02-2025 (La.11/1/02), 828 So.2d 571, 572. A buyer can recover directly from the manufacturer for breach of warranty, despite the fact that there is no privity of contract between them. Aucoin v. Southern Quality Homes, LLC, supra, at 692.
In this case, the trial court held that the redhibitory defects were manufacturing defects, for which the manufacturer is liable. The trial court found that there was “overwhelming evidence indicating that the overheating was caused by a design flaw in the way the heating elements were cooled,” which was clearly 110attributable to the manufacturer. Based on our de novo review of the record, we find no manifest error in the trial court’s finding that the manufacturing defects were redhibitory. Finding no error in the trial court’s finding of redhibitory defects, we affirm the judgment as amended, supra.

OBLIGATION TO TENDER

In its second assignment of error, Multiaqua argues that the trial court erred in failing to find that Live Oak suffered a “diminution” of Multiaqua’s warranty because Live Oak refused to allow Multiaqua to “repair” the units.
First, the buyer’s obligation to tender the product for repair or correction applies only to a good-faith seller but not to a manufacturer, who is presumed to have knowledge of the defects. Hale Farms, Inc. v. Am. Cyanamid Co., 580 So.2d 684, 695 (La.App. 2 Cir.1991), writ denied, 586 So.2d 537 (La.1991).
Second, the record reflects that Live Oak did allow Multiaqua the opportunity to repair the units by installing a deflector inside of the unit to deflect air toward the heating coils to cool the coils. Carlos Mena installed and adjusted deflectors inside of the air handler at Multiaqua’s direction, but the repair did not correct the problem of the units’ overheating.
Finally, “[t]he fact that the defects were confined to a specific part of the machinery and that the units could have been made to function properly by installing new motors or by rehabilitating the defective ones, does not furnish a valid basis for denying plaintiff the remedy of redhibition provided by Article 2520.” Radalec, Inc. v. Automatic Firing Corp., 228 La. 116, 122-23, 81 So.2d 830, 832 (1955). We find no merit in Multiaqua’s argument that its warranty against defects was somehow “diminished” by the buyer’s decision not to attempt further repairs. This assignment of error lacks merit.

PRUDENT ADMINISTRATOR

Inin its third assignment of error, Multiaqua argues that the trial court erred in failing to find that Live Oak did not act as a prudent administrator. Specifically, Multiaqua contends that the trial court *369 erred in finding that “by the time of trial [the units] had become antiquated and essentially unmarketable.”
La. C.C. art. 2532 provides:
A buyer who obtains rescission because of a redhibitory defect is bound to return the thing to the seller, for which purpose he must take care of the thing as a prudent administrator, but is not bound to deliver it back until all his claims, or judgments, arising from the defect are satisfied.
If the redhibitory defect has caused the destruction of the thing the loss is borne by the seller, and the buyer may bring his action even after the destruction has occurred.
If the thing is destroyed by a fortuitous event before the buyer gives the seller notice of the existence of a redhibitory defect that would have given rise to a rescission of the sale, the loss is borne by the buyer.
After such notice is given, the loss is borne by the seller, except to the extent the buyer has insured that loss. A seller who returns the price, or a part thereof, is subrogated to the buyer’s right against third persons who may be liable for the destruction of the thing.
At trial, Multiaqua’s principal, Ralph Fe-ria, testified that the air handler units that he recovered from Live Oak had been stored for at least four years, by the time of trial, in non-climate-controlled shipping containers, which were not weatherproof. His expert testified that at least one-third, if not more, of the units were inside of cardboard boxes that had disintegrated under the storage conditions. Mr. Feria stated that, based on the conditions the units had been exposed to while in Live Oak’s care, there value was as “scrap.”
Live Oak’s agent, Joey Baldassaro, testified that the units is question became obsolete in 2010 when the refrigerant, R-22, was discontinued for use in new air conditioning systems.
|iaBased on the testimony and evidence introduced at trial, the trial judge found .that Multiaqua did not establish that Live Oak failed to act as a prudent administrator. See, Hughes v. Goodreau, 01-2107 (La.App. 1 Cir. 12/31/02), 836 So.2d 649, 666, writ denied, 03-0232 (La.4/21/03), 841 So.2d 793. A court of appeal may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Rosell v. ESCO, 549 So.2d 840 (La.1989). We find no manifest error in the trial court’s ruling. This assignment of error lacks merit.

MULTIPLE BUYERS

In its fourth assignment of error, Multiaqua argues that Live Oak is not the only buyer so its interest should have been limited to a reduction in price proportionate to its interest.
La. C.C. art. 2538 reads, in pertinent part: “Multiple buyers must concur in an action for rescission because of a redhibi-tory defect. An action for reduction of the price may be brought by one of multiple buyers in proportion to his interest.”
At trial, Live Oak’s representative, Joey Baldassaro, testified that Live Oak was the sole owner of the air handler units at all times pertinent to this litigation. Accordingly, we find no merit in Multiaqua’s argument.

DAMAGES

Lastly, Multiaqua levies complaints against several items of damages the trial court awarded, including the removal and replacement of 172 air handler units; electrical voltage testing of air handler units performed by Live Oak; and storage fees.
In this case, Live Oak presented evidence of the following expenses at trial, *370 including 1) $108,095.50 for the installation and removal of 173 units; 2) |ia$15,479.11 for electrical testing of the units; and $13,835.00 for storage of the units after removal.
The trial judge, however, awarded 1) $77,197.50 for removal and replacement of 172 Multiaqua units; 2) $15,479.11 for electrical testing of the units; and 3) $8,585.00 for storage of the units after removal, which is significantly lower than the damages prayed for by Live Oak.
On appeal, Multiaqua seeks diminution of the quantum of damages awarded.
A manufacturer is “liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees.” La. C.C. art. 2545. The trier of fact is given much discretion in the assessment of damages. La. C.C. art. 2324.1. The ultimate determination by an appellate court as to whether a judge abused their “much discretion” as a matter of law in awarding damages is a judgment call. Coco v. Winston Indus., Inc., 341 So.2d 332, 335 (La.1976); Carnaggio v. Cambre, 11-552 (La.App. 5 Cir. 12/13/11), 84 So.3d 631, 640.
Before an appellate court can disturb a trial court’s award, the record must clearly reveal that the trier of fact abused its discretion in making its award. Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976). “Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.” Id.
Upon review, we find that the record does not clearly reveal an abuse of discretion by the trial court in its award. Finding no abuse of the trial court’s discretion, we find this argument without merit.

JUDGMENT OF OCTOBER 19, 2012 AMENDED AND AFFIRMED, AS AMENDED.

. Each unit was equipped with an auto-limiter, which is a factory-installed safely switch that shuts off electricity to the metal heating coil when the temperature inside of the unit reaches 140°F.

. According to Live Oak's maintenance records introduced at trial, Live Oak removed 164 of the units by December 22, 2009. Further, according to their records, three units were still in use at its clients’ complexes at the time of trial.

. On November 2, 2012, Live Oak filed stipulations into the district court record admitting that it could not establish that Carrier was not a good-faith seller or knew or could have known that the units in question was redhibi-torily defective. At trial, the parties stipulated that Carrier’s attorneys’ fees were $26,328.16.

. The total attorney fee award was $65,575.88 + $5,512.50, which totals $71,088.38.