**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 96-30544

RALPH KAMPEN; KATHERINE KAMPEN,

Plaintiffs - Appellants,

VERSUS

AMERICAN ISUZU MOTORS, INC.,

Defendant - Appellee.

Appeal from the United States District Court
For the Eastern District of Louisiana

September 30, 1998

Before POLITZ, Chief Judge, and KING, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, PARKER, and DENNIS, Circuit Judges.

JOHN M. DUHÉ, JR., Circuit Judge:

Ralph and Katherine Kampen brought this diversity action against American Isuzu Motors ("Isuzu") under the Louisiana Products Liability Act of 1988, LA.REV.STAT.ANN. §§ 9:2800.51-.59 (West 1991)("LPLA" or "the Act"). The Kampens claimed that Mr. Kampen ("Kampen") was injured when an Isuzu factory-supplied tire jack collapsed and the car it was supporting crashed down on Kampen's shoulders.

Isuzu moved for summary judgment on two elements of the

Kampens' products liability claims. First, Isuzu asserted that there was no evidence that the jack was unreasonably dangerous. Second, Isuzu claimed that Kampen's use of the jack was not a "reasonably anticipated use." The district court granted summary judgment in Isuzu's favor, finding that Kampen's use of the jack was not one that the manufacturer should have "reasonably anticipated," citing, *inter alia*, our decision in Lockart v. Kobe Steel Ltd., 989 F.2d 864, 867 (5th Cir. 1993).

A panel of this Court reversed the district court. See Kampen v. American Isuzu Motors, Inc., 119 F.3d 1193 (5th Cir. 1997)("the panel opinion"). The panel opinion held that Kampen's "use" of the jack was complete when he finished elevating the car; in the panel majority's view, Kampen's getting under the car to inspect the underside did not constitute a "use" of the jack. See Kampen, 119 F.3d at 1198-99, and cf. Kampen, 119 F.3d at 1205 (Duhé, J., dissenting). Any negligence on Kampen's part in placing his body beneath the car, the panel reasoned, should be taken into account by Louisiana's system of comparative fault. See Kampen, 119 F.3d at 1199.

Even assuming that Kampen's placing himself under the car constituted a "use" of the jack, the panel was "unwilling to hold that, as a matter of law, the manufacturer should not have reasonably expected a user to place part of his or her body beneath a jacked up car." Id. The panel also found that the presence of two warnings not to "get beneath the vehicle" (one included in the owner's manual, the other in the car's spare-tire compartment) did

2

not, as a matter of law, make Kampen's use one that should not have been "reasonably anticipated." See id. at 1199-1201. The panel therefore concluded that the summary judgment evidence "present[ed] a question for the jury regarding whether Kampen's use of the jack was reasonably anticipated." Id. at 1201.

This Court granted *en banc* rehearing. See 130 F.3d 656 (5th Cir. 1997).

## I.

In 1993, the Kampens' daughter noticed a noise coming from beneath her 1989 Isuzu Impulse. Her father agreed to investigate. Kampen used the car's factory-provided jack to raise the car's front end on the driver's side. Viewing the evidence in the light most favorable to the nonmovant, Kampen jacked up the car in a manner consistent with the instructions provided in the Owner's Manual ("manual") for elevating the car. Kampen's deposition testimony indicated, however, that he did not read the manual before jacking up the car. He therefore did not read the warning contained in the manual which instructed the user to "[u]se the jack only when changing tires" and expressly warned "[n]ever [to] get beneath the car when using the jack."[1]

Suspecting that something was caught behind the front wheel on the driver's side, Kampen placed his head and shoulders beneath the

---

[1]There was also a set of jacking instructions in the tire storage compartment. Those instructions stated that "[t]he jack is designed for use only when changing wheels," and admonished the user "[n]ever [to] get beneath the vehicle when it is supported only by a jack." The Kampens dispute that there was any evidence of these warnings.

3

front of the car to examine the back of the wheel. The jack collapsed, and the car fell across Kampen's shoulders, breaking both of his collarbones.

## II.

The LPLA provides the "exclusive theories of liability for manufacturers for damage caused by their products" under Louisiana law. LA.REV.STAT.ANN. § 9:2800.52. Section 2800.54 of the LPLA sets forth the basic parameters for a products liability action under the Act:

> The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of a product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.

LA.REV.STAT.ANN. § 9:2800.54(A).[2] The plain language of the Act shows that a plaintiff, asserting a products liability action against a manufacturer, faces a two-tiered burden: the plaintiff must show that (1) his damages were proximately caused by a characteristic of the product that renders it unreasonably dangerous, and (2) his damages arose from a reasonably anticipated use of the product. See LA.REV.STAT.ANN. § 9:2800.54(D); see also Johnson v. Black & Decker U.S., Inc., 701 So.2d 1360, 1362 (La. App. 2d Cir. 1997). If a plaintiff's damages did not arise from a reasonably anticipated use of the product, then the "unreasonably

---

[2]A claimant can prove that a product was unreasonably dangerous in four different ways: (1) in construction or composition; (2) in design; (3) because of an inadequate warning; or, (4) because of nonconformity to an express warranty. LA.REV.STAT.ANN. § 9:2800.54(B).

4

dangerous" question need not be reached.  See Johnson, 701 So.2d at 1366; Delphen v. Department of Transportation and Development, 657 So.2d 328, 334 (La. App. 4th Cir. 1995).

A.

The LPLA defines a reasonably anticipated use as "a use or handling of the product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances."  LA.REV.STAT.ANN. § 9:2800.53(7).  This objective inquiry requires us to ascertain what uses of its product the manufacturer should have reasonably expected at the time of manufacture.  See Myers v. American Seating Co., 637 So.2d 771, 775 (La. App. 1st Cir. 1994); see also John Kennedy, A Primer on the Louisiana Products Liability Act, 49 La.L.Rev. 565, 585-86 (1989)("Kennedy").  The LPLA's "reasonably anticipated use" standard should be contrasted with the pre-LPLA "normal use" standard;  "normal use" included "all intended uses, as well as all reasonably foreseeable uses and misuses of the product."  Hale Farms, Inc. v. American Cyanamid Co., 580 So.2d 684, 688 (La. App. 2d Cir. 1991), citing Bloxom v. Bloxom, 512 So.2d 839, 843 (La. 1987).  "Normal use" also included "reasonably foreseeable *misuse* that is contrary to the manufacturer's instructions."  Hale, 580 So.2d at 688.

It is clear that by adopting the reasonably anticipated use standard, the Louisiana Legislature intended to narrow the range of product uses for which a manufacturer would be responsible.  See, e.g., Delphen, 657 So.2d at 333; Myers, 637 So.2d at 775.  We know

5

that, under the LPLA, a manufacturer will not be responsible for "every conceivable foreseeable use of a product." London v. MAC Corp. of America, 44 F.3d 316 (5th Cir. 1995); see also Kennedy, 49 La.L.Rev. at 586. For example, in Myers, the Louisiana First Circuit Court of Appeal held that, while it is *conceivable* that a person might stand on the rear portion of a folding chair (thereby causing it to jackknife), this would not be a *reasonably anticipated* use given the obvious danger of such a use. Myers, 637 So.2d at 779. The scope of the reasonably anticipated use standard, however, remains imprecise.

B.

Under the liability scheme set up by the LPLA, then, Kampen's injuries must have arisen from a reasonably anticipated use of the jack. But that begs the following question: which of Kampen's actions on the day of his injury should we consider as "use" of the jack? Did Kampen's "use" of the jack end when he had properly positioned the jack and elevated the car to a suitable height? Did Kampen continue to "use" the jack after that by relying on the jack to hold the car elevated above him while he inspected its underside? Should Kampen's admitted *purpose* in jacking the car up (to inspect the car's underside, or, more precisely, the back of the front wheel) be a factor in assessing how he "used" the jack?

An answer to these questions is crucial in properly assessing whether Kampen's injuries arose from a reasonably anticipated use of the jack. The panel opinion, as stated above, broadly defined Kampen's "use" of the jack as simply jacking up the car. See

6

_Kampen_, 119 F.3d at 1198. The panel found that Kampen's subsequent actions constituted, not a continuing "use" of the jack, but instead a "[p]lacing [of] oneself in the zone of danger created by the product." _Id_. In the panel's view, the _purpose_ for which a product is employed is relevant to "use" only "to the extent that the purpose affects the manner in which the product is handled":

> In this case, the use to which Kampen put the jack did not create a defect that would not have otherwise existed. That is, the fact that he was under the car did not make the failure any more or less likely to occur. The risk that Isuzu was required to take into account in designing, manufacturing and warning about the jack was that the jack would collapse under the weight of the vehicle it was designed to lift.

_Kampen_, 119 F.3d at 1198-99. Because Kampen's presence and actions beneath the car had no effect on the mechanical performance of the jack itself, the panel reasoned, what Kampen did subsequent to physically jacking up the car should not be included in his "use" of the jack. Put another way, Kampen's getting under the car was not a "use" of the jack because those actions did not have any impact on whether the jack would, or would not, have failed. This accords with the panel's view that the mechanical failure of the jack was the only risk the manufacturer was required to take into account, regardless whether Kampen was beside the car changing the tire, or beneath the car inspecting the wheel, when the jack failed. See _id_. at 1199.

At the outset, we note that the level of generality at which a plaintiff's "use" of a product is defined will bear directly on whether the plaintiff satisfies the LPLA's reasonably anticipated

7

use requirement.  In this case, if we consider that Kampen's "use" of the jack includes his jacking up the car and nothing else, then the question of reasonably anticipated use answers itself:  a manufacturer quite reasonably anticipates his jack to be used for jacking!  On the other hand, if we define Kampen's "use" by including his behavior *subsequent* to the physical act of elevating the car (i.e., his crawling under the car), then reasonably anticipated use becomes a much closer question:  manufacturers may or may not *reasonably* anticipate users of their products to disregard express warnings about the product and thereby place themselves in physical danger.

We agree with the panel majority that the scope of use must be delineated with reference to "the apparent purpose of the reasonably anticipated use requirement," namely,

> ...to express the types of product uses and misuses by a consumer that a manufacturer must take into account when he designs a product, drafts instructions for its use and provides warnings about the product's dangers in order that the product not be unreasonably dangerous.

Kampen, 119 F.3d at 1198, quoting Kennedy, 49 La.L.Rev. at 584. That is to say, we agree that the risks a manufacturer must take into account when designing and providing warnings about his product should govern, to some degree, how we define a plaintiff's "use" of that product.  Where we diverge from the panel opinion, however, is in appreciating the breadth of those risks.

It is implicit in the panel opinion that the product risks (and, hence, a potential user's actions) a manufacturer should take

8

into account are only those which involve the possible *physical stresses* placed on the product. See Kampen, 119 F.3d at 1198-99. Thus, goes the argument, only those actions of a plaintiff which put various physical stresses on the product should be defined as "use." Id. But a plaintiff may act in relation to a product in such a way that, while it does not change the physical stresses placed on a product, *nevertheless increases the risk of injury associated with the product*. A manufacturer is required to take these kinds of actions by product users into account when designing and providing warnings for its product. Surely the manufacturer, Isuzu, was required to contemplate not only the risks associated with the proper physical manipulation of the jack, but also the risks associated with the purpose for which the jack would be employed (i.e., whether the jack would be used for changing tires or instead as a support for repairs to the car's undercarriage).

Certainly lines must be drawn between those actions of a plaintiff which will and will not constitute "use" of a product: we would not say, for example, that the brand of shirt Kampen was wearing when he was crawling under the car should figure into his "use" of the jack. Isuzu was not required to anticipate whether potential users of its jack would be wearing Polo, Izod or J.C. Penney sportswear because those aspects of Kampen's behavior have nothing to do with the risks contemplated in designing a jack. But whether or not Kampen was going to jack the car up and then crawl under it bears directly on the decisions Isuzu must make in designing a product that is not unreasonably dangerous.

We thus define Kampen's "use" of the jack at a level of generality that will take into account the risks Isuzu must (or should) have reasonably contemplated when designing the jack and providing warnings for its use. Kampen began using the jack when he elevated the car with it. When Kampen finished jacking the car up, however, his use of the jack did not conclude. Thereafter, Kampen used the jack *by relying on the jack to hold the car in its elevated position*. When Kampen placed himself beneath the car, he was still using the jack: he was *relying on the jack to hold the car above his body*. There is no requirement in the LPLA that "use" necessarily involve a physical touching of the product. "Handling" does indeed seem to suggest some physical contact with the product, but we observe that "reasonably anticipated use" is defined in terms of a "use *or* handling" of the product. See La.Rev.Stat.Ann. § 9:2800.53(7)(emphasis added). The disjunctive implies that "use" need not *always* involve the physical manipulation of the product.

We emphasize that our assessment of what "use" Kampen made of the jack does not depend in any way on his mental state. We are able to determine how Kampen was using the jack by objectively viewing (and making reasonable inferences from) *what he actually did* and not what he intended to do. It would be nonsensical to make use depend on something as evanescent as the user's mental state. If Kampen had jacked up the car, fully intending to crawl under it and inspect its underside, but the jack had collapsed before he could do so, certainly we would not say that Kampen's "use" was somehow determined by his free-floating intent to do

10

something he had not yet done.  In that case, we would take the facts before us and conclude that Kampen's use of the jack consisted only in jacking the car up.  He didn't *do* anything following that.

We add that Louisiana courts of appeal have also defined "use" at this level of generality.  For example, in <u>Delphen v. Department of Transportation and Development</u>, 657 So.2d 328 (La. App. 4th Cir. 1995), the court addressed whether a plaintiff, who rode a racing bike without properly adjusting the "quick release" mechanism on the front wheel, had engaged in a reasonably anticipated use of the bike.  The court found that, given the obvious danger of the plaintiff's actions, the plaintiff had not used the bike in a reasonably anticipated manner.  <u>Delphen</u>, 334 So.2d at 334.  In doing so, the court defined the plaintiff's "use" of the bike with reference to the following actions:

> ...the fact that Robert Delphen rode the bicycle across the Chef Menteur drawbridge without obtaining additional instructions regarding the bicycle's proper use and knowing that the wheel previously had become loose, was not a reasonably anticipated use of the product.

<u>Id</u>.  The court could have defined the plaintiff's use of the bike as simply "riding the bike," which certainly would have been a reasonably anticipated use of a bicycle.  The court did not do so, however.

Similarly, in <u>Johnson v. Black & Decker U.S., Inc.</u>, 701 So.2d 1360 (La. App. 2d Cir. 1997), the court affirmed a jury's conclusion that using a circular saw after removing its safety

11

guard was not a reasonably anticipated use of the saw.  Id. at 11.
The court decided the case based on the assumption that the
plaintiff's "use" of the saw included the fact that the guard had
been removed.  See id. at 6 (asking whether "subsequent use of the
altered saw" was a reasonably anticipated use).[3]  The court did not
define "use" at the higher level of generality (i.e., simply
"cutting wood"), but instead included the plaintiff's negligent
actions as part of "use."[4]

Finally, this Court has itself defined "use" as including some
of the plaintiff's negligent conduct.  In Hunter v. Knoll Rig &
Equipment Mfg. Co., Ltd., 70 F.3d 803 (5th Cir. 1995), the question
was whether the decedent had been using a "drilling rig racking
board" in a reasonably anticipated manner when the pipes he was
racking collapsed and killed him.  The majority found no reasonably
anticipated use of the racking board, because the manner in which
the decedent had been racking the pipes was obviously dangerous and
contrary to industry practice.  Hunter, 70 F.3d at 810.  Clearly,

_____

[3]The court discussed Berry v. Commercial Union, 565 So.2d 487
(La. App. 2d Cir. 1990), a pre-LPLA case which also dealt with a
power saw from which the plaintiff had removed the safety guard.
The Johnson court characterized the Berry plaintiff's "use" of the
altered saw as "abnormal use ... either ignoring instructions that
the guard was missing or failing to notice such an obvious danger
and carrying the saw in his subordinate hand while climbing an
unsecured ladder."  Johnson, 701 So.2d at 8 n.3.

[4]In a pre-LPLA case, Hale Farms, Inc. v. American Cyanamid
Co., 580 So.2d 684 (La. App. 2d Cir. 1991), the court addressed
whether applying herbicide in a manner contrary to the label
instructions was "normal use" of the herbicide.  The court
implicitly considered the "use" of the herbicide to include not
only the actual spraying of the product, but also the quantities
and concentration of the sprayed herbicide which were contrary to
the label instructions.  See Hale Farms, 580 So.2d at 688.

12

the majority defined "use" as including not only the obvious use of the racking board to rack pipe, but also the dangerous manner in which the decedent was racking the pipe. Id. This is underscored by the dissent in Hunter, where Judge Benavides advocated a broader view of "use":

> ...the evidence reflects that the racking board was being used for its intended purpose (racking pipe) and in a manner that a jury could conclude was common.

Id. at 812 (Benavides, J., dissenting). The dissent in Hunter would have found the "overall use of the racking board" to be "routine," and would have allowed comparative fault principles to account for the decedent's negligence in racking the pipe. Id. at 813. The majority in Hunter, however, included in its conception of "use" those aspects of the decedent's behavior that increased the risk of injury associated with the product.

We find that the reasoning in Hunter is consistent with the treatment of this issue by Louisiana appellate courts and conclude that Kampen's getting under the car to inspect its underside constituted a "use" of the jack.

C.

Given that conception of "use," we are led to the crucial question: was Kampen's use of the jack one that Isuzu should have reasonably anticipated? The district court said "no": relying on Lockart, the court found that a manufacturer should not reasonably anticipate that a user will disregard two explicit warnings and place himself, in direct contravention of those warnings, in a position of obvious peril. In confronting this question, we must

13

therefore address what impact an express warning should have on whether the use of a product is reasonably anticipated.

1.

The meaning of our decision in Lockart broods over this case. In Lockart, two workers suspended a steel pontoon with chains from the teeth of an excavator's bucket and got underneath the pontoon to work on it. The chains slipped, and the pontoon fell, killing one man and injuring the other. An instruction in the operator's manual for the excavator warned, "Never lift a load from the bucket teeth," and was accompanied by a diagram. See Lockart, 989 F.2d at 865-66. We held that summary judgment against the plaintiffs was appropriate because the plaintiffs had not sustained their burden of showing that the decedents' use of the excavator was reasonably anticipated. Id. at 869. Exactly *why* the plaintiffs failed to meet their burden of proof is somewhat ambiguous and requires us to clarify Lockart's holding.

Lockart held that the use of the excavator was not reasonably anticipated for two, alternative reasons: (1) because an adequate warning was provided, cautioning against the very conduct the decedents engaged in, and (2) because even if the decedents had no knowledge of that warning, the danger inherent in their use of the excavator should have been obvious. See Lockart, 989 F.2d at 866-67 & 868. The plaintiffs, who bore the burden of proving reasonably anticipated use, failed to meet that burden because they failed to provide proof that "another warning would have been feasible or that these experienced workers should not have

14

reasonably appreciated the risks involved in suspending the pontoon from the bucket teeth." Id. at 869.

Lockart is, at bottom, an obvious danger case. But a close reading of the decision shows that the obviousness of the danger was based in significant part on the warnings provided with the excavator. In unequivocal language, the Lockart court stated:

> When a manufacturer expressly warns against using a product in a certain way in clear and direct language accompanied by an easy to understand pictogram, *it is expected that an ordinary consumer would not use the product in contravention of the express warning.*

Id. at 867 (emphasis added). What has engendered some confusion and has led many to dismiss the block-quoted language as *dictum* is the sentence which follows: "Here, however, the owners manual and thus the warning probably never reached the ultimate users." Id. But given its proper context, the block-quoted language is simply not *dictum*. It is in fact one element in the overall equation demonstrating why the decedents' conduct was in the face of obvious danger and was thus not a reasonably anticipated use of the excavator.

Language from other parts of Lockart confirms this view. For example, the defendants asserted that, because the decedents' use was not reasonably anticipated, the court would not have to reach the unreasonably dangerous question (which could have involved, *inter alia*, analyzing the adequacy and effect of the warning). See id. at 866; see also discussion supra Part II & n.2. Tellingly, the court responded that

> ... [i]n this case, however, since **we hold**

15

> that the use was not reasonably anticipated ***because under the circumstances an adequate warning was provided***, our analysis extends to the warnings.

Lockart, 989 F.2d at 866 (emphasis added). The emphasized language illuminates two crucial aspects of Lockart: (1) that the language about adequate warnings was holding and not *dictum*, and (2) that reasonably anticipated use was intertwined with the character and adequacy of the warnings. Otherwise, the whole discussion of the adequacy of the warnings would have been surplusage. See id. at 867-68.

We thus read Lockart as a decision about the relationship between obvious danger and express warnings. Lockart addresses the situation where a manufacturer provides an express warning cautioning against a use of the product for which the product was neither designed nor intended, and where the plaintiff acts in direct contravention of that warning. In that case, the plaintiff's "use" of the product will not be a reasonably anticipated one, unless, as Lockart itself observed, "the plaintiffs had presented evidence that despite the warnings, [the manufacturer] should have been aware that operators were using the [product] in contravention of certain warnings." Id. at 868.

Our holding on this point does not mean that an adequate warning will *always* be dispositive of reasonably anticipated use. Such a view would render superfluous the risk/utility balancing test in § 2800.56 of the LPLA, which instructs the court to "consider an adequate warning about a product" in determining whether a product is unreasonably dangerous in design. See

16

LA.REV.STAT.ANN. § 9:2800.56(2). But merely because the LPLA includes an adequate warning as one ingredient in the "unreasonably dangerous design" test does not mean that a court is precluded from considering an adequate warning in relation to other areas of the Act. The LPLA itself requires that, as a threshold for liability, the plaintiff's damages arise from a reasonably anticipated use of the product. What we say here is only that a warning against a product *misuse*[5] is relevant to assessing what uses of its product a manufacturer reasonably anticipates. When, in the face of such a warning, a plaintiff presents no evidence about whether the manufacturer should have reasonably expected users to disregard the warning, the plaintiff fails to meet the burden imposed on him by

---

[5]We also note that our holding will not, as the panel majority feared, allow malevolent manufacturers to absolve themselves from liability for uses (or misuses) of their products which the *evidence shows* should have been reasonably anticipated despite a warning to the contrary. See Kampen, 119 F.3d at 1201 ("Such a rule would allow a manufacturer to insulate itself from liability for uses of a defective product that are unquestionably reasonably anticipated."). It would be legally ineffective if, for example, Isuzu had warned against using its jack to change the tires on the Impulse, a user had nonetheless used the jack to change a tire, and was injured in the process. In that case, a court should find that, despite the warning, using a factory-supplied jack to change a tire (which is the very purpose for which the jack was supplied) is, in the panel majority's words, "unquestionably [a] reasonably anticipated" use.

17

the LPLA.[6]  See LA.REV.STAT.ANN. § 9:2800.54(D).[7]

---

[6]As the Restatement recognizes, a warning against specific misuses of a product will not *in every case* prevent a plaintiff who contravenes that warning from pursuing a claim against the manufacturer:

> [I]nstructions and warnings may be ineffective because users of the product may not be adequately reached, may be likely to be inattentive, or may be insufficiently motivated to follow the instructions or heed the warnings. (...) Warnings are not ... a substitute for the provision of a reasonably safe design.

RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. l (1998).  Our decision in this case is not to the contrary:  we simply hold that the Kampens must provide evidence that Isuzu should have known its otherwise adequate warnings were being disregarded by product users in this particular way.

The Texas Supreme Court's recent decision in Uniroyal Goodrich Tire Company v. Martinez, No. 95-1159, 1998 WL 352929 (Tex. July 3, 1998) also explores the relationship between warnings and design defects under the Restatement (Third) of Products Liability.  In Uniroyal, the plaintiff was injured when he attempted to inflate a 16" tire on a 16.5" tire rim, in contravention of the tire manufacturer's express warnings, and the tire exploded.  While conceding his disregard of the warnings, the plaintiff nonetheless argued that the tire was defectively designed because the manufacturer could have implemented an alternative tire design that would have prevented the explosion, and, thus, his injuries.  A five-justice majority of the Texas Supreme Court affirmed the jury's finding that the tire was defective.  The court recognized that, under the Restatement, warnings and instructions are *relevant* but not determinative in assessing whether a product is reasonably safe.  See Uniroyal, 1998 WL 352929, at *5-6, citing, *inter alia*, RESTATEMENT (THIRD) OF TORTS:  PRODUCTS LIABILITY § 2 & cmt. f.  The court held, however, that there was evidence from which a jury could have reasonably determined that, despite the adequate warning, Uniroyal's failure to implement the alternative design rendered the product defective.  See Uniroyal, 1998 WL 352929, at *6-7.  Four justices dissented, arguing that the majority had not properly interpreted the Restatement and had failed to give the warnings adequate consideration in the "reasonably safe" calculus. See id. at *14-15 (Hecht, J., dissenting).  The dissenting justices would have found the tire reasonably safe as a matter of law.  See id. at *18-19 (Hecht, J. dissenting).

Of course, Uniroyal is not controlling on the outcome here, since we interpret the LPLA and not Texas law, and we address the threshold issue under the LPLA of reasonably anticipated use rather than unreasonable dangerousness.  See id. at *4-6 (following RESTATEMENT (SECOND) OF TORTS, § 402A, and RESTATEMENT (THIRD) OF TORTS:

18

PRODUCTS LIABILITY § 2(b)). We nonetheless note the decision because it focuses on the impact of warnings in a products liability case, albeit in a different context. We also observe that while the majority and dissenting opinions in <u>Uniroyal</u> disagree over the meaning of comment l to § 2 of the Restatement (Third) of Products Liability, both opinions agree that warnings and instructions are relevant to whether an injured plaintiff who disregards a warning can nonetheless maintain an action under a design defect theory.

[7]Our clarification of <u>Lockart</u> could be read to conflict with the Eighth Circuit's decision in <u>Chronister v. Bryco Arms</u>, 125 F.3d 624 (8th Cir. 1997). In <u>Chronister</u>, the court held that the use of a handgun in contravention of an express warning could be a "reasonably anticipated use" under Missouri law "if that misuse is reasonably foreseeable." <u>Id</u>. at 627. There, the plaintiff used a handgun for target practice without wearing hearing protection, despite warnings to the contrary; when the gun misfired, the plaintiff sustained permanent hearing damage. <u>Id</u>. at 625. The defendant argued that it could not have reasonably foreseen the use of its gun without hearing protection, and, further, that "use of a product that contradicts the product's instructions or warnings is not a 'reasonably anticipated use.'" <u>Id</u>. at 627. The Eighth Circuit rejected both arguments.

The court observed that a basic tenet of products liability law, and one followed in Missouri, is that "a manufacturer cannot escape strict liability for a defective product that has been misused by the plaintiff, if that misuse is reasonably foreseeable." <u>Id</u>., <u>citing</u> 63A Am.Jur.2d <u>Products Liability</u> § 967 (1997), <u>and</u> <u>Nesselrode v. Executive Beechcraft, Inc.</u>, 707 S.W.2d 371, 381 (Mo. 1986)(en banc). The court then pointed to evidence that the defendant "knew that some people used weapons without hearing protection." <u>Chronister</u>, 125 F.3d at 627. Thus, a jury could have reasonably found that the plaintiff's misuse of the gun was nonetheless "reasonably foreseeable" by the defendant.

We first observe that the <u>Chronister</u> court's conception of the "use" of the gun is similar to our view here. The court did not broadly define the plaintiff's "use" as merely "firing the gun." Instead, the court implicitly considered "use" to include firing the gun *without hearing protection*, a "use" which did nothing to make the gun more or less likely to misfire, but which did increase the risk of using the gun. <u>See</u> discussion <u>supra</u> Part II.B.

Second, the <u>Chronister</u> court's resolution of the "reasonably anticipated use" issue is not at all contrary to ours. Just as we would, the Eighth Circuit required proof that the defendant knew its product was being misused in a particular way. <u>Chronister</u>, 125 F.3d at 627. If the plaintiff had *not* provided such proof, we presume that the plaintiff could *not* have established that his admitted misuse of the gun was nonetheless a reasonably anticipated use.

We recognize that, under Louisiana law, comparative fault principles generally account for a plaintiff's negligent conduct. See Kampen, 199 F.3d at 1199;  see also Bell v. Jet Wheel Blast Div. of Ervin Indus., 462 So.2d 166 (La. 1985), and Thomas C. Galligan, The Louisiana Products Liability Act:  Making Sense of It All, 49 La.L.Rev. 629, 685 (1989)(stating "the obvious":  "that the [LPLA] makes no change in Louisiana's comparative fault law").  But it is argued that our view of Kampen's "use," combined with our view of the interrelationship between warnings and reasonably anticipated use, impermissibly conflates "product misuse" and a plaintiff's comparative fault.  The argument goes that we are making "reasonably anticipated use" do the work that comparative fault is intended to do by including Kampen's negligence in getting under the car as part of his "use" of the jack.

It is true that Kampen's disregard of the product's warnings and his exposing himself to obvious danger is the kind of conduct that, ordinarily, would be assigned to the plaintiff as a percentage of fault under the Louisiana system of comparative fault.  See LA.CIV.CODE.ANN. art. 2323 (West 1997).  It is equally true, however, that the Louisiana Legislature, in drafting the LPLA, included the following prerequisite to recovery under the Act:  "...when such damage arose from a reasonably anticipated use of the product...."  LA.REV.STAT.ANN. § 9:2800.54(A).  That language raises "reasonably anticipated use" -- a concept that necessarily includes *some* aspects of a plaintiff's *conduct* -- to the level of liability determiner (i.e., if a plaintiff has engaged in conduct

20

which renders his use of the product not reasonably anticipated by the manufacturer, then his recovery is not merely reduced by his percentage of fault -- he cannot recover at all).

This view does not, however, write comparative fault out of Louisiana products liability law. A plaintiff's negligent conduct *which does not remove his use of the product from the realm of reasonably anticipated uses* may nevertheless contribute to cause his injuries. Such negligence will lessen a plaintiff's recovery without barring his right to recover altogether. Suppose, for example, that Kampen had used the jack only to change a tire and the jack had collapsed; the manufacturer had provided no adequate instructions regarding the use of the jack, and the correct manner of use was not obvious; the collapse occurred partly as a result of Kampen's negligent failure to fit the lifting arm of the jack into a special notch and partly as a result of some unrelated defect in the jack's composition. In this example, Kampen used the jack to change a tire, but physically manipulated the jack in an improper manner that was not specifically warned against nor obviously dangerous. We submit that this hypothetical negligent use would be "reasonably anticipated"; the manufacturer would be liable and damages apportioned by comparative fault.

It is also pointed out that Kampen's placing himself beneath the car did not make the jack any more or less likely to fail. It is urged that when a plaintiff misuses a product (i.e., uses the product in a way not reasonably anticipated by the manufacturer), that misuse should only bar the plaintiff's recovery where the

21

misuse causes the product to fail. In other words, there must be a causal connection between product misuse and product failure.

While that may be an eminently reasonable view of what products liability law *should* be, it is, however, not what the Louisiana Legislature codified in the LPLA. The threshold requirements for liability under the LPLA do not link product misuse with product failure. Instead, the LPLA requires a link between *damages* and *reasonably anticipated use*. The flip side of that requirement is that if damages are linked to a product misuse (i.e., one that is not reasonably anticipated), then those damages are not recoverable under the Act.

Louisiana cases have recognized the necessary causal relationship between product misuse and damages in finding that a product has not been put to a reasonably anticipated use. In Johnson v. Black & Decker, the plaintiff argued that his alleged misuse of a saw (operating it without the safety guard) was irrelevant, as his injury would have occurred regardless. The court agreed that this was the correct issue, and asked whether "the device[], had [it] been left in place, would have more likely than not prevented the *injury*." Johnson, 701 So.2d at 1365 (emphasis added). After reviewing the evidence, the court concluded that the plaintiff had "failed to prove that a saw properly equipped with a gravity guard would, more probably than not, have caused his injuries." Id. at 1366. It therefore "perceive[d] no manifest error in the jury's conclusion that [his] use of the unguarded saw was not reasonably anticipated...." Id.

22

In other words, the court found the plaintiff's misuse of the saw to be determinative of the reasonably anticipated use question because the plaintiff's *damages* were causally linked to that misuse. As Kampen's damages were unquestionably linked, insofar as causation is concerned, to getting under the car, we break no new ground in this case.[8]

### III.

We have thus far determined that Kampen's "use" of the jack included not only jacking up the car, but also his crawling under the car to inspect its underside. We have also determined that under the LPLA and the cases interpreting it, when a plaintiff misuses a product, in direct contravention of a warning, his "use" will not be reasonably anticipated unless the plaintiff can show that the manufacturer should have known that product users "were

---

[8]In Hale Farms, supra Part II.B & n.4, the Louisiana Second Circuit addressed whether spraying of herbicide contrary to the label instructions constituted "normal use" of the herbicide (pre-LPLA standard). The court stated at the outset that "normal use" included "reasonably foreseeable *misuse* that is contrary to the manufacturer's instructions." Hale Farms, 580 So.2d at 688. The court affirmed the trial court's finding that using 10 gallons of water (instead of 20 gallons, as the label instructed) for spraying was a "reasonably foreseeable (mis)use of the product." Id. at 691. By contrast, the court reversed the trial court on whether using the wrong product-to-acre ratio was a "reasonably foreseeable misuse." Id. at 693. What accounts for the difference is this: the evidence showed that varying the amount of water (at least within 10 to 20 gallons) *would not have* changed the product's effectiveness, but that varying the product-to-acre ratio *would have*. See id. at 689-91, 691-94. Thus, the court, even under the broader "normal use" standard, required a causal link between *product misuse* and *damages* (i.e., the persistence of weeds and consequent damage to the soybean crop despite treatment with the herbicide) in order for misuse to bar a plaintiff's claims. See id. at 694 ("The record does not support the trial court's finding that the *low crop yields* ... were caused by a product defect.")(emphasis added).

using the [product] in contravention of certain warnings." Lockart, 989 F.2d at 868. All that remains, then, is that we examine the summary judgment record to see if the Kampens adduced such evidence.

The deposition testimony of Dr. Tom Shelton, the plaintiff's expert, appears in the record. Shelton, a metallurgist, examined the damaged jack, performed "hardness" tests on the steel composing the jack, and compared the jack to other, similar jacks. He testified about the possible forces acting on the jack when it collapsed and opined that the softness of the metal used in the Isuzu jack was a contributing cause of the jack's failure.

Two exchanges during Shelton's deposition bear on the "reasonably anticipated use" question:

Q: Is it fair to say that the loading in this case, [sic] you can't tell me if it occurred during the reasonably anticipated use of the jack?

SHELTON: The use of the jack, as it was being used on the day, is a reasonably anticipated use only because there is a large history of people using it in this manner.

Q: And what manner is that? To lift a vehicle?

SHELTON: To lift a vehicle. Okay. So from that point of view, I would say it's reasonably anticipated. *What the history of the jack is, other than that, I couldn't tell you.*

Q: Is it reasonably anticipated use of a jack to use it to lift something on an unlevel surface?

SHELTON: Yes. It is.

Q: In terms of a reasonably anticipated use of a jack, *is it reasonably anticipated to be under the vehicle, using the jack as the supporting member of the vehicle?*

SHELTON: *That's reasonable to anticipate that someone*

24

*would do that, yes.*

* * * * *

Q:   And I assume because you have not reviewed the warnings, you are not of the opinion that there is some inadequacy of warnings regarding the vehicle and/or the jack.

SHELTON:  *I have no statement on warnings.*

(Emphasis added).  In speculating on what uses of the jack would be reasonably anticipated, Shelton thus opined that it would be "reasonable to anticipate" that someone would rely on the jack to support the vehicle over his or her body.  Since this is the only evidence in the summary judgment record bearing on the question, we will confine ourselves to asking whether Shelton's statement was sufficient to create a genuine fact issue as to reasonably anticipated use and thereby avoid summary judgment.

Shelton testified as a metallurgist, whose area of expertise "deals with the extraction of metals from their ores, refining them, and preparing them for use and includes processes (as alloying, rolling and heat-rolling) and the study of the structure and properties of metals."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1420 (3d ed. 1981).  Thus, Shelton's opinion on, for example, the relative strength of the steel used in the jack's composition would likely create a fact issue for summary judgment purposes.  We would even go so far as to say that Shelton could have created a fact issue as to the reasonably foreseeable *mechanical* uses of the jack (e.g., when he testified that it would be reasonably anticipated for the jack to be placed on uneven surfaces).

Shelton's testimony, however, as to whether the manufacturer

25

should have reasonably expected users to place themselves under a jacked-up car, is not sufficient to create a genuine issue as to that fact. Notwithstanding Shelton's qualifications as a metallurgist, he was not qualified to testify as to the habits of users of automobile jacks nor about their propensities for disregarding explicit warnings. Additionally, Shelton's testimony is internally inconsistent: he asserted initially that he knew nothing of the "history" of the jack's use beyond its obvious use for lifting a car; only two questions later, he ventured an opinion about exactly such behavioral "history" of the product's users. Shelton himself admitted to having "no statement about warnings," and so could not have created a genuine issue as to whether jack users were disregarding the warnings at issue. "It goes without saying that such conclusory, unsupported assertions are insufficient to defeat a motion for summary judgment." Marshall v. East Carroll Parish Hospital Services District, 134 F.3d 319, 324 (5th Cir. 1998).

IV.

We thus find that the Kampens have not adduced competent summary judgment evidence showing that Kampen's use of the jack in contravention of a warning was nonetheless reasonably anticipated. Consequently, the Kampens have failed to meet the burden imposed on them by LA.REV.STAT.ANN. § 9:2800.54(D), namely, to show that Kampen's damage arose from a reasonably anticipated use of the

jack.  We therefore AFFIRM the judgment of the district court.[9]

AFFIRMED.

---

[9]We note in closing that we neither approve nor disapprove of Part IV of the panel opinion, which addressed Isuzu's alternative contention that the summary judgment record presented no genuine issues of fact regarding whether the tire jack was unreasonably dangerous.  See Kampen, 119 F.3d at 1201-05.  It is unnecessary to reach the unreasonable dangerousness issue in light of our decision here that Kampen's injuries did not arise from a reasonably anticipated use of the jack.  See LA.REV.STAT.ANN. § 9:2800.54(A).

BENAVIDES, Circuit Judge, with whom POLITZ, Chief Judge, SMITH, WIENER, STEWART and PARKER, Circuit Judges, join in all parts, and DENNIS, Circuit Judge, joins in all parts save Part IIB, dissenting:

The sole en banc issue in this case is whether Mr. Kampen's use of the original-equipment scissors jack to elevate the Isuzu car with which the jack was supplied and which the jack was designed to elevate was a "reasonably anticipated use" of the jack under the Louisiana Products Liability Act of 1988, LA. REV. STAT. ANN. §§ 9:2800.51–.59 (West 1991) ("LPLA" or "the Act"), in light of the fact that, in contravention of an express warning, he had partially slid underneath the car immediately before the collapse of the jack. The majority holds that Isuzu should not have reasonably anticipated that an individual would use the jack to elevate the car and then slide beneath the vehicle despite a warning to the contrary. Because I conclude that Kampen used the jack in a manner that should have been reasonably expected by its manufacturer, I dissent.

I.

The operative summary judgment facts of this case are straightforward. As the majority notes, Mr. Kampen jacked up the car in a manner fully consistent with the instructions given in the owner's manual: He placed the automatic transmission in "park," he blocked the opposite tire, and he placed the upper part of the jack in a special notch intended for that purpose, located between the door opening and the wheel. Suspecting that a foreign object was caught behind the front left wheel, Kampen lay on the ground and slid part-way under the car, thereby placing his head and shoulders

28

under the front of the car, in an effort to examine the back or interior side of the wheel visually.  Positioning his body in this manner was contrary to the Isuzu-provided instructions which Kampen had not read. While Kampen was in that position, the jack spontaneously collapsed, causing the car to fall and strike him across the shoulders, breaking both of his collarbones.  Kampen never so much as brushed against the underside of the car from the time he completed the jacking process until the jack collapsed.

The Kampens' expert identified the jack's "failure mode" as a "shearing of the [metal] teeth which are at the base of the bottom set of legs for the scissors jack" in combination with "the dimensions of the contacting surfaces."  The expert testified that the steel was "soft on this jack, real soft . . . about as soft as you can get."

II.

A.

The Kampens brought suit against Isuzu under the LPLA, a *sui generis* products liability law drafted exclusively for Louisiana. Although the LPLA's drafters drew upon external sources such as the United States Department of Commerce's Model Uniform Product Liability Act in drafting the LPLA, the "reasonably anticipated use" element and the role that it plays in the LPLA statutory scheme are unique to Louisiana law.  *See* John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 La. L. Rev. 565, 569 (1989).  "Reasonably anticipated use" is a term of art, which the

29

LPLA defines as "a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." LA. REV. STAT. ANN. § 9:2800.53(7).[10]

As John Kennedy, one of the drafters of the LPLA, has explained, the LPLA's treatment of use "departs from prior [Louisiana] law but only in one respect[:] . . . by substituting 'reasonably anticipated use' for 'normal use.'" Kennedy, 49 LA. L. REV. at 584. Before the LPLA's September 1988 effective date, a Louisiana products liability claimant had to show that "his damage resulted from a condition of the product that made it unreasonably dangerous to *normal use*." *Bloxom v. Bloxom*, 512 So. 2d 839, 834 (La. 1987) (emphasis added) (citations omitted). "Normal use" included "all intended uses, as well as all foreseeable uses and misuses of the product." *Id.* (citations omitted). The introduction of the phrase "reasonably anticipated" was intended to narrow the test for the "uses" that the manufacturer had to take into account. *See* Kennedy, 49 LA. L. REV. at 584; *see also Dunne v. Wal-Mart Stores, Inc.*, 679 So. 2d 1034, 1037 (La. App. 1996); *Myers v. American Seating Co.*, 637 So. 2d 771, 775 (La. App. 1994)(citations omitted); *Daigle v. Audi*, 598 So. 2d 1304, 1307 (La. App. 1992); *Walker v. Babcock Indus., Inc.*, 582 So. 2d 258, 259 (La. App. 1991).

Since the enactment of the LPLA, the Louisiana courts have

---

[10]I note the obvious but important point that, in the Act, "reasonably" modifies "anticipated," not "use." A "use" can be unreasonable yet, at the same time, be "reasonably anticipated" by a manufacturer.

most frequently defined "reasonably anticipated use" in terms of what it is not, contrasting a reasonably anticipated use with one that is merely "conceivable." *See Myers*, 637 So. 2d at 779 ("Although this use may be a conceivable use, it is not a reasonably anticipated use."); *Delphen v. Department of Transp. & Dev.*, 657 So. 2d 328, 333 (La. App. 1995) ("The more restrictive scope of liability [under the reasonably anticipated use standard] was meant to avoid prior confusion because virtually any conceivable use is foreseeable.") (citation omitted); *see also* Kennedy, 49 LA. L. REV. at 596 ("'Reasonably anticipated use' . . . convey[s] the important message that the manufacturer is not responsible for accounting for every conceivable foreseeable use."). For example, a manufacturer might conceivably foresee, but would not reasonably anticipate, that "a consumer might use a soft drink bottle for a hammer, might attempt to drive his automobile across water or might pour perfume on a candle to scent it." Kennedy, 49 LA. L. REV. at 586. By excluding such situations, "the drafters of the LPLA believed that 'reasonably anticipated use' would serve the same purpose as 'normal use' but do so more efficiently." *Id.* at 585. As the majority acknowledges, however, the boundaries of the reasonably anticipated use test nevertheless remain imprecise.

### B.

As did the district court, the majority concludes that Kampen's use of the jack was not reasonably anticipated by Isuzu. Like the panel majority before us, I disagree. None can question

31

that the reasonably anticipated use of the jack was to elevate and keep elevated the very Isuzu Impulse with which the jack was supplied.  And none can question that Kampen used the jack to elevate the car and keep it elevated.  This use is not merely reasonably anticipated; it is the precise use intended by the manufacturer.  Scissors jacks cannot see or hear, so what their users do (other than bumping into them or the cars they have lifted) after using such jacks to elevate and suspend the cars cannot affect the jacks.  What the user does during or after that use — whether it be changing a wheel, removing a shy cat from the chassis, rescuing a trapped child, or looking for the source of wheel noise — cannot retrospectively alter the use to which the jack has been put, that is, to elevate the car and keep it elevated, unless what the user does increases what is required of the jack to elevate the car and keep it elevated.

 Kampen's "keep it elevated" use of the jack continued while he proceeded to slide under the car in order to examine the back or interior side of the left front wheel.  Unfortunately, before he could do so, the jack failed in the "keep elevated" facet of its reasonably anticipated use when its metal teeth sheared, allowing the vehicle to fall on Kampen, suddenly and without warning.  As this failure was spontaneous and wholly internal to the jack, the vehicle would have dropped when it did even if Kampen had been changing the left front wheel rather than attempting to look behind it.  Indeed, the jack would have failed, and the vehicle would have fallen if Kampen had walked away from the car immediately after

32

elevating it with the jack. Logic defies any conclusion other than that the Kampens' damages arose from Mr. Kampen's reasonably anticipated use of the jack.

At bottom, this case is just that simple.  This can be illustrated by posing the rhetorical question, "How do you use a scissors jack to change a tire?" and by answering it, "You don't; you use a tire tool[11] and your own two hands to change a tire; you use a scissors jack only to elevate a car and hold it there." Because there is no property of a scissors jack that lends itself to checking the interior side of a wheel to determine the source of a noise, Kampen could not and thus did not use the jack for that purpose; neither could he have used the jack to change a flat tire because no property of the jack lends itself to that purpose: The jack has no lug wrench and no hubcap removal device.  To repeat, only two human hands and one or more tire tools can be "used" to change a wheel.  The jack serves merely to facilitate the tire-changing process by elevating and supporting the car during the time it takes to remove and replace the tire.

The fact that Kampen got under the vehicle while it was held aloft by the jack did not somehow transform his use of the jack from a reasonably anticipated use to a use not reasonably anticipated.  After all, not every action taken in connection with

---

[11]Typically, such a device is a round steel bar or tube which is bent at approximately 45 degrees near one end and which has a lug wrench on one end and a hubcap wedge on the other.

33

a product constitutes a "use" of the product.[12]  Accordingly, our task in conducting this analysis is to determine what kind of plaintiff conduct should be considered in connection with anticipated use and what kind should not.

Both the language of the LPLA and the cases that have interpreted its "reasonably anticipated use" element suggest that this requirement is aimed principally at the manner in which, or method by which, the claimant operated or handled the product.  The Act defines "reasonably anticipated use" in terms of the "use or handling" of a product.  LA. REV. STAT. ANN. § 9:2800.53(7).  Similarly, those courts that have construed Louisiana's reasonably anticipated use element since the Act was adopted have considered the plaintiff's "use" of the product to be his direct interaction with the product.  *See Lockart*, 989 F.2d at 868 (the use of an excavator was hanging a pontoon from the bucket of the excavator with a chain); *Myers*, 637 So. 2d at 779 (the use of a folding chair was standing on the back instead of the front portion of its seat); *Delphen*, 657 So. 2d at 333 (the use of the bicycle was riding it with the front tire loose).[13]

---

[12]Indeed, the drafters of the LPLA, who considered the Model Uniform Product Liability Act ("MULPA") in drafting the LPLA, *see* Kennedy, 49 LA. L. REV. at 570, eschewed the phrase "reasonably anticipated *conduct*," which is used in MULPA, and instead chose the phrase "reasonably anticipated *use.*"  *Compare* Model Uniform Product Liability Act, § 102, *reprinted in* 44 FED. REG. 62714 (1979), *with* LA. REV. STAT. ANN. § 9:2800.53(7).

[13]Dictionaries also define "use" primarily in terms of the manner in which or the method by which something is handled or employed. *See, e.g.*, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1299 (1984) (defining "use" as "the act or practice of employing something . . .[;] the fact or state of being used . . .[;] a method or manner of

34

When viewed in the light most favorable to the Kampens, the summary judgment evidence shows that the manner in which Mr. Kampen used the jack was one that Isuzu should have reasonably expected. Again, he properly placed the jack; he operated it in an unremarkable manner; and he even blocked the opposite wheel as suggested in the owner's manual.[14]  Isuzu must have anticipated the purpose for which Kampen used the jack — to elevate the very car with which it was provided.  Kampen's getting under the car is not analogous to using a Coke bottle as a hammer, driving a car on water, using perfume to scent a candle, *see* Kennedy, 49 LA. L. REV. at 586, or hanging a steel pontoon from the teeth of an excavator, *see Lockart*, 989 F.2d at 864.

At most, Kampen placed himself in the "zone of danger" created by the unreasonably dangerous jack.  Placing oneself in the zone of danger created by a defective product, however, is altogether different from "using" the product.  For example, in *Lockart*, the "use" that the court found was not reasonably anticipated was not

_____

employing or applying something . . . .") (first set of definitions).  In some cases, of course, the purpose for which the product is used is inseparable from the manner of use.  Another dictionary combines the concepts of manner and purpose, defining use as "[t]he act of using; the application or employment of something *for some purpose*." THE AMERICAN HERITAGE DICTIONARY 1331 (2d Coll. Ed. 1985).  For example, if a consumer uses a soda bottle as a hammer, the purpose for which the product is used (to flatten or nail something) is intertwined with how the product was used (hitting the bottle against a surface).

[14]Although Isuzu presented some evidence that Kampen used the jack on an uneven surface, Kampen's expert testified that the physical evidence suggested that the base of the jack was "flat or relatively flat" when it collapsed, which is accepted as true for summary judgment purposes.

35

the action of the plaintiffs in standing underneath the suspended steel pontoon but rather their dangling the pontoon from the teeth of an excavator bucket. *Lockart*, 989 F.2d at 868.[15] In Kampen's case, getting under the car while it was being held aloft by the jack was not a "use" of the jack within the meaning of the Act any more than his retrieving a hat that is blown under the elevated car would be "using" the jack, or for that matter, than a child's crawling underneath the elevated car to retrieve a toy would be "using" the jack. Defining the scope of use in this way is consistent with the purpose of the reasonably anticipated use requirement: "to express the types of product uses and misuses by a consumer that a manufacturer must take into account when he designs a product, drafts instructions for its use and provides warnings about the product's dangers in order that the product not be unreasonably dangerous." Kennedy, 49 LA. L. REV. at 584.

One common thread runs through all the cases in which the

_____

[15]The majority argues that *Johnson v. Black & Decker U.S., Inc.*, 701 So.2d 1360, 1362 (La. App. 1997), somehow undermines my understanding of use. *Johnson*, however, involved the plaintiff's use of a miter saw after a safety guard designed to protect the user's hands had been removed. Pre-LPLA case law held that the use of a saw after the removal of a safety guard was not a normal use. *See Berry v. Commercial Union Ins. Co.*, 565 So.2d 487 (La. App. 1990). The *Johnson* court concluded that the use of a saw after the removal of a guard was *a fortiori* not a reasonably anticipated use. *Johnson*, 701 So.2d at 1365. Unlike the plaintiff's use of the saw in *Johnson* after its unanticipated alteration that made the saw more dangerous, Kampen used the jack in this case in the condition that Isuzu supplied it and in the manner instructed. Holding that Kampen's getting under the car is relevant to the reasonably anticipated use analysis would be like the *Johnson* court holding that Johnson's use of a saw manufactured *without a guard* was not reasonably anticipated because he placed his hand in front of the unguarded blade.

36

Louisiana courts have found that a use of a product was not reasonably anticipated. In every one, the manufacturer would have had to do something else to make the product safe (or, more precisely, not unreasonably dangerous) for the <u>un</u>anticipated use, *i.e.*, something that the manufacturer did not have to do to make the product safe for its reasonably anticipated use. For example, in *Myers v. American Seating Co.,* a Louisiana court of appeal held that a manufacturer should not have reasonably anticipated that someone would stand on the rear portion of a folding chair's seat, causing the chair to jackknife. The court explained: "The evidence shows that, in a reasonably anticipated use, the [folding chair] performed in the manner a folding chair should perform. Only when used in the manner [the plaintiff] used the chair, namely standing on the rear portion of the chair seat, would the chair jackknife." 637 So. 2d at 779. In other words, the hands-on (more precisely feet-on) way in which the claimant handled the product caused it to exhibit a dangerous characteristic that the product would not have exhibited if it had been used in a manner that the manufacturer could reasonably have expected.[16] That is simply not the case we

___

[16]The majority suggests that the relevant link is not between the plaintiff's conduct and the product's failure but between the plaintiff's conduct and the plaintiff's damages. To be sure, the LPLA requires that the plaintiff prove that his "damage arose from a reasonably anticipated use of the product." LA. REV. STAT. ANN. § 9:2800.54(A). The question of just what conduct of the plaintiff is relevant to the reasonably anticipated use analysis, however, precedes the issue whether a use was reasonably anticipated and, if so, whether the plaintiff's damages arose out of that reasonably anticipated use.

The court of appeal's decision in *Johnson v. Black & Decker*, 701 So.2d 1360 (La. App. 1997), does not undermine my understanding of

have here.  The forces operating on the jack in this case — only mass and gravity — were identical to those that would have been at play had Kampen been changing a tire.  If anything, the forces were less: Kampen testified that he did not touch the underside of the car before the jack collapsed; had he been changing a tire, some force would have been transmitted to the car by loosening and removing the lug nuts, pulling the flat tire off, putting the spare

use and the required relationship between the plaintiff's conduct and the product's failure.  In *Johnson*, the plaintiff severed two fingers using a miter saw.  The saw as manufactured was equipped with a guard, but that guard had been removed.  The court explained that the "outright removal of the guard, without even a substandard replacement, was not a reasonably anticipated alteration," that pre-LPLA case law held that use of a saw after a guard was removed was not a normal use, and that *a fortiori* the use of a saw after a guard was removed was not a reasonably anticipated use. 701 So.2d at 1365.

The plaintiff in *Johnson* argued that, even if his use of the saw after the guard's removal was not reasonably anticipated, his recovery should not be barred because his injuries would have occurred even had the guard been in place.  *Id.*  The court accepted this argument on its own terms, although it concluded that the evidence did not support that the damages would have occurred even had the guard been in place.  *Id.* at 1366.  As the *Johnson* court explained, whether the plaintiff's use of the saw without a guard was reasonably anticipated would be moot if the injury would have occurred even had the guard been left in place.  701 So.2d at 1365. In effect, the *Johnson* court gives plaintiffs a route to circumvent the reasonably anticipated use analysis; that is, if the plaintiff can show that his injuries *would have* occurred in a reasonably anticipated use of the product then it does not matter that his actual use was not reasonably anticipated.  Thus, the requirement of a causal connection between the plaintiff's misuse and the plaintiff's damages established by the *Johnson* court provides a shield for the plaintiff against his unanticipated use.  That is a far cry from holding, as the majority does, that the reasonably anticipated use element bars recovery whenever there is a causal link between any aspect of the plaintiff's conduct and his damages. Neither should *Johnson* be read to mean that there need not be any relationship between the plaintiff's conduct and the failure of the product before that conduct is relevant to the reasonably anticipated use analysis.

tire back on the wheel lugs, and resecuring the lug nuts. In no way whatsoever did the fact that Kampen was under the car make the jack's failure any more likely to occur. The risk that Isuzu was required to take into account in designing, manufacturing, furnishing, and warning about the jack was that it would collapse spontaneously under the weight of the vehicle that it was purportedly designed and manufactured to lift and hold aloft for at least as long as it takes to change a tire (*i.e.*, the risk that it would fail when used as reasonably anticipated). Producing a jack that would have been safe for Kampen to achieve his goal — checking for the source of tire noise — would have required nothing more than what was required to make the jack safe and effective for its intended purpose.

There is no Louisiana case in which a court found that a plaintiff's use was not reasonably anticipated when, as here, there was absolutely no nexus between the plaintiff's conduct and the failure of the product. This understanding of use is consistent with the traditional role of "normal use," which was linked to the defectiveness of the product under the pre-LPLA law of Louisiana. *See Weber*, 250 So.2d at 756 (defining "defective" as "unreasonably dangerous to normal use"). The LPLA drafters plainly did not intend to change the essential function of the misuse element. *See* Kennedy, 49 LA. L. REV. at 584. In fact, *every* case on which the majority relies involved plaintiff behavior that contributed in some manner to a product's failure.

It has nevertheless been suggested by the majority that, even

though Kampen's presence under the vehicle did not have anything to do with the jack's failure, it increased the risk associated with the jack's failure and therefore should be considered part of the use of the jack. Although it is true that Kampen would not have suffered his precise injuries — conceivably none at all — had he not been underneath the vehicle, the plain language of the LPLA does not require that the *damages* resulting from the failure of a product in its reasonably anticipated use have been reasonably anticipated; the Act requires only that the damages arise out of a reasonably anticipated *use* of the product. *See* LA. REV. STAT. ANN. § 9:2800.54(A). Considering the risk of harm (or reasonable anticipation of the risk of harm) as part of the reasonably anticipated use analysis conflates and confuses reasonable anticipation of use with reasonable anticipation of the risk of harm. Although foreseeability of the risk of harm is properly taken into consideration under other elements of the plaintiff's case, such as proximate cause[17] and design defect,[18] it is never relevant to the analysis of reasonably anticipated use.

Assume, for example, that while a plaintiff is transporting collectible books worth thousands of dollars in a recreational vehicle ("RV"), the steering wheel falls off when the RV takes a sharp right turn. As a result, the driver loses control of the

---

[17]A manufacturer is only liable for "damages proximately caused by a characteristic of the product that renders the product unreasonably dangerous . . . ." LA. REV. STAT. ANN. § 2800.54(A).

[18]The LPLA requires the factfinder to balance the likelihood and gravity of harm against the burden of an alternative design. LA. REV. STAT. ANN. § 9:2800.56

vehicle, and it careens off the road. The driver breaks his leg in the impact, but manages to escape before the vehicle catches fire. Unfortunately, however, the books are destroyed in the fire. The manufacturer obviously cannot defend a products liability action for the driver's personal injuries on the basis that the driver's damages did not arise out of a reasonably anticipated use of the RV simply because it was being used to transport books rather than to take a pleasure trip. Neither should a separate use analysis be available to the manufacturer when it is sued for the loss of the books. The transport of collectible books may have increased the quantum or changed the kind of damages suffered by the plaintiff, but, for the purposes of the reasonably anticipated use analysis, there is no requirement that the manufacturer have reasonably anticipated the type and quantum of the plaintiff's *damages*, only that the damages arose out of a reasonably anticipated use of the RV. This does not necessarily mean that our hypothetical plaintiff will be able to recover for the loss of the books, however, as he may not be able to prove other elements of his case, such as proximate cause. *See* LA. REV. STAT. ANN. § 2800.54(A). Again, there is no nexus between the presence of the books in the RV and the failure of the product — like the absence of a nexus between Kampen's presence under the car and the failure of the jack, but unlike Myers's standing on the rear of the seat of the folding chair and its failure. To hold that the RV's use was not reasonably anticipated because the plaintiff's conduct worsened the injuries suffered as a result of the failure of the product during

a reasonably anticipated use makes "reasonably anticipated use" do the work of other elements of products liability law.

Moreover, to the extent that Kampen's subsequent negligent conduct in sliding under the elevated vehicle increased the risk of harm from the jack's wholly unrelated failure, Louisiana's system of comparative fault serves to ensure that the manufacturer will not have to bear that percentage of Kampen's damages that is attributable to his own negligent conduct, as opposed to the defectiveness of the jack. *See Bell v. Jet Wheel Blast, Div. of Ervin Indus.*, 462 So. 2d 166 (La. 1985); Thomas C. Galligan, *The Louisiana Products Liability Act: Making Sense of It All*, 49 LA. L. REV. 629, 685 (1989) (stating "the obvious": "that the [LPLA] makes no change in Louisiana's comparative fault law"). Indeed, the impetus for applying comparative fault in products liability cases is to provide the proper incentives to both the product user and the product manufacturer. *See Bell*, 462 So.2d at 171-72. As we explained when adopting comparative fault in strict products liability under our maritime jurisdiction:

> The comparative fault standard allows the price of the product to reflect the cost of its non-negligent use. Hence a comparative fault standard allows the economically efficient amount of the product to be used.

*Lewis v. Timco, Inc.*, 716 F.2d 1425, 1433 (5th Cir. 1983) (en banc). Treating Kampen's negligence as a complete bar to his recovery in this case would undermine the manufacturer's incentives to produce a product that is safe in its reasonably anticipated use by immunizing the manufacturer in those cases in which the plaintiff's damages result from a reasonably anticipated use of the

42

product, but are also magnified by his own misconduct.

When a product is unreasonably dangerous in a use that the manufacturer could reasonably anticipate, the fact that the claimant has placed himself in the zone of danger created by that defective product should not serve as a *per se* bar to the claimant's recovery; at most it should reduce the quantum of his recovery based on the percentage of his comparative fault. *Cf. Terrebonne v. Goodman Mfg. Corp.*, 687 So.2d 124 (La. App. 1996). If the Louisiana legislature had intended the reasonably-anticipated-use requirement to function as a contributory negligence bar, it could have said so.[19] As Louisiana had, at the time of the LPLA's enactment, only recently supplanted its old contributory negligence bar by adopting comparative fault in ordinary tort situations, ascribing such an intention to the state's products liability theory is particularly counterintuitive. The majority provides little assurance that comparative negligence would still play a viable role in Louisiana product liability law, given its example of a plaintiff who might still maintain a claim under the LPLA. The majority asserts that Louisiana's comparative fault regime is adequately respected and maintained if a jury is

_____

[19]The LPLA's definition of "adequate warning" suggests that the Louisiana legislature did not consider "ordinary" to be synonymous with "reasonable": unlike the definition of reasonably anticipated use, which refers to an "ordinary person," *see* LA. REV. STAT. ANN. § 9:2800.53(7), the definition of "adequate warning" speaks of an "ordinary *reasonable* user." *See id.* § 9:2800.53(9) (emphasis added). It thus appears that the LPLA's drafters did not intend to remove all unreasonable, and hence all negligent, product usage from the scope of reasonably anticipated use, regardless of whether such negligence is defined by reference to an unheeded warning.

allowed to judge the comparative negligence of an individual who improperly manipulates a defective jack. In the majority's hypothetical, the plaintiff does not act in contravention of a warning, the manufacturer has not provided adequate instructions, the correct manner of usage is not clear, and the improper positioning of the jack is not obviously dangerous. That the majority must stretch this far — relying on a hypothetical plaintiff who is not even clearly negligent — illustrates the degree to which it has subsumed comparative fault within its conception of use that is not reasonably anticipated. Under the majority's holding, one is hard pressed to envision a plaintiff who interacts with a product in such a way that he is negligent and yet has still engaged in a reasonably anticipated use; this is particularly so for the class of individuals who fail to heed warnings accompanying the products they use. By allowing all plaintiff conduct that increases the risk of damages to define use, the majority comingles reasonably anticipated use with comparative negligence to come up with use that is not reasonably anticipated.

## C.

Even assuming, *arguendo*, that getting under the car was somehow a "use" of the jack, we need not, and therefore I would not, hold that, as a matter of law, the manufacturer should not have reasonably expected a user to place part of his or her body underneath a jacked-up car. Persons changing tires cannot avoid placing their hands and forearms around the tire and thus under

44

the wheel well, not to mention that their hands, arms, and even portions of their torsos, can be expected to be under the car briefly when, for example, the tire changer reaches for lug nuts that have rolled under the vehicle. It stretches credulity to imagine that Isuzu was not aware that hands, feet, arms, and other extremities would often be under a car elevated with its scissors jack, regardless of the goal of the person using the jack. The likelihood that portions of the user's body will be under the vehicle, however fleetingly, is one of the many reasons why a manufacturer must design and fabricate a jack that will not collapse spontaneously under the weight of the vehicle that it is designed to support.

Affirmative evidence may have been necessary in *Lockart* to inform the jury how an excavator is used because excavators are products that are outside the experience and understanding of the average juror. But jurors do not need an expert to tell them that individuals who use automobile jacks allow parts of their bodies to be under the vehicle, albeit ever so briefly. This is not speculation; it is common sense grounded in virtually universal experience. It is well within the bounds of propriety for us to take judicial notice of the fact that a substantial number of persons who use automobile jacks will place parts of their bodies underneath cars held aloft by jacks. *Cf. United States v. Ho*, 94 F.3d 932, 937 (5th Cir. 1996) (taking judicial notice of the "ubiquity of plastic 'swipe' cards in our modern society"); *id.* at 946 (Barksdale, J., dissenting) (taking judicial notice that

45

plastic swipe cards "are very, very seldom, if ever, blank on one side").

It is a flaw of logic to conclude that, just because Kampen may have behaved unreasonably when he slid under the car, the manufacturer should not have reasonably anticipated that someone would do just that. Indeed, the Supreme Court of Louisiana has recognized that it can be reasonably expected that ordinary people will sometimes act without reasonable care. *See Levi v. Southwest La. Elec. Membership Co-op.*, 542 So. 2d 1081, 1086 (La. 1989) (explaining that a power company's placement of electrical lines "may demand precautions against 'that occasional negligence which is one of the ordinary incidents of human life and therefore to be anticipated'")(citing *Murphy v. Great Northern Ry. Co.*, 2 Ir. Rep. 301 (1897))(other citations omitted). No doubt there will be overlaps between unreasonable uses of a product and uses of a product that the manufacturer should not reasonably anticipate. A use may be so unreasonable that, as a matter of law, no manufacturer should be held to have reasonably anticipated it. *See, e.g.*, *Hunter*, 80 F.3d at 137 (per curiam denial of rehearing); *Lockart*, 989 F.2d at 868. Kampen's actions, though, do not fall within that category. Even assuming that he acted negligently in getting under the jacked-up car, a jury could still find that his actions were or should have been reasonably anticipated by the manufacturer of the jack. Had this case not been dismissed at the summary judgment stage, I harbor little doubt that a Louisiana jury would have seen to it that

Kampen not be unduly rewarded for any irresponsibility on his part.

D.

Finally, I turn to the role that Isuzu's warnings should play in the reasonably anticipated use analysis. In support of its conclusion that Kampen's use was not reasonably anticipated, the district court relied on two warnings given by Isuzu, one in the owner's manual and the other on the vehicle's spare-tire compartment, which cautioned jack users not to "get beneath the vehicle."

This court in *Lockart* extensively discussed an instruction in the excavator operator's manual, which counseled against using the excavator to lift anything by the teeth of the excavator's bucket. In that case, two experienced workers suspended a steel pontoon from the teeth of the excavator's bucket with chains and then got underneath the pontoon to work on it. 989 F.2d at 865. The chains slipped and the pontoon fell, killing one of the men and injuring the other. *Id.* The *Lockart* plaintiffs tried to turn the warning against the manufacturer, arguing that the presence of the instruction indicated that the manufacturer reasonably anticipated that workers would use the teeth of the excavator's bucket as a suspension device. We rejected that argument, noting:

When a manufacturer expressly warns against using the product in a certain way in clear and direct language accompanied by an easy to understand pictogram, it is expected that an ordinary consumer would not use the product in contravention of the express warning.

47

*Id.* at 867.[20]  Ultimately, however, the decision in *Lockart* did not turn on the warning, which the court acknowledged probably never reached the workers.  Instead, the court noted that "[e]ven if the warning did not reach the users," the dangers of dangling a steel pontoon by a chain from the teeth of an excavator bucket "should have been obvious to the ordinary consumer and certainly to experienced workers."  *Id.* at 868.  And, as we indicated in *Hunter v. Knoll Rig Equipment Manufacturing Co.*, this court's decision in *Lockart* ultimately turned on the obviousness of the danger inherent in stringing a steel pontoon from the teeth of an excavator bucket.  70 F.3d 803, 806 & n.4 (5th Cir. 1995), *reh'g denied with per curiam opinion*, 80 F.3d 136 (5th Cir. 1996).  For this reason alone, then, the panel majority's decision in the instant case was not in conflict with *Lockart.* Furthermore, placing the emphasis on the obviously dangerous nature of plaintiffs' interactions with products is consistent with Louisiana state court decisions that have found certain uses outside the scope of reasonably anticipated use.  *See, e.g.*, *Myers*, 637 So. 2d at 779 ("[A]ny danger presented by standing on a folding chair is an obvious danger to a reasonable person.");

---

[20]The court in *Lockart* refused to allow the plaintiff to "hoist [the defendant] by its own petard."  70 F.3d at 866. Clearly, any given warning may not by itself demonstrate that a warned-against use is reasonably anticipated.  A manufacturer should not be held responsible for a use not reasonably anticipated solely because such a use is conceivable and because the manufacturer took the added precaution of warning against the conceivable, but not reasonably expected, use.  At the same time, it cannot logically be said that any warning takes the proscribed act out of the realm of reasonably anticipated use.

*Delphen*, 657 So. 2d at 333-34 ("Danger imposed by the wheel would have been obvious to a reasonable person.").

Even more basically, the text and structure of the LPLA make plain that the presence of an adequate warning is not dispositive of the reasonably anticipated use inquiry. The Act provides that a warning is merely one factor to be considered in conducting the risk-utility balancing test to determine whether a product has an unreasonably dangerous design. LA. REV. STAT. ANN. § 2800.56(2).[21] There would be no need to include this provision in the Act if an adequate warning would always dispose of the reasonably anticipated use inquiry, which precedes the design defect analysis. *See Johnson v. Black & Decker*, 701 So.2d 1360, 1365 (La. App. 1997) (citing *Hunter*, 70 F.3d 803). Notwithstanding the majority's claim that it may rely on a warning to dismiss a plaintiff's use as not reasonably anticipated even without explicit statutory authority to do so, it is not proper to ascribe surplusage or redundancy to legislative drafting. Moreover, adopting a *per se* rule that any warned-against use is not reasonably anticipated would produce harsh and unintended results, allowing a manufacturer to insulate itself from liability for uses of a defective product that are unquestionably reasonably anticipated. Suppose, for example, that Isuzu equipped its cars with tires that consistently fail when the cars

_____

[21]Louisiana is not alone in this approach. The Supreme Court of Texas recently held that an adequate warning is not *per se* dispositive of a claim that a product is defective in design or construction. *See Uniroyal Goodrich Tire Co. v. Martinez*, No. 95-1159, 1998 WL 352929, at *1 (Tex. July 3, 1998).

49

are driven faster than 40 miles per hour and that Isuzu provided a conspicuous and plain warning in each owner's manual that its cars should not be driven faster than 40 miles per hour. Would it follow that driving an Isuzu car at a speed exceeding 40 m.p.h. is not a reasonably anticipated use? Obviously not. Yet the majority provides incentive for the manufacturer to privilege warnings over the safety of the product itself.

The majority has suggested that a warning is not *per se* dispositive in the sense that the plaintiff can avoid summary judgment by presenting evidence, above and beyond proof of the facts of the accident, that the manufacturer should have reasonably anticipated that the product would be used in contravention of the warning. Presumably, such evidence would take the form of expert testimony.[22] I would hold, instead, that under the LPLA, proof of the presence of a warning or instruction, without more, does not provide a basis for summary judgment in the manufacturer's favor on the reasonably anticipated use issue when the operative facts of the accident would allow a reasonable jury, in the exercise of its members' common sense and life experiences, to conclude that the use was reasonably anticipated. For example, suppose that an automobile manufacturer warns that its car should not be driven on wet

---

[22]It is safe to assume that, under the majority's holding, expert testimony will be required as a general rule, given the majority's indication that the Kampens' expert metallurgist "was not qualified to testify as to the habits of users of automobile jacks nor about their propensities for disregarding explicit warnings." Slip Op. at 26.

pavement.  To avoid summary judgment when faced with evidence of such a warning, should the plaintiff be required to present affirmative evidence (likely in the form of expert testimony) that a manufacturer should have reasonably anticipated that its car would nevertheless be driven in the rain?  The answer should be no.[23]  Yet the majority will now require a plaintiff to parade expert witnesses before the jury to state what in many cases will be the obvious.[24]

---

[23]Suppose that the plaintiff is injured while boiling potatoes on a stove that explodes. The plaintiff proves that his use was reasonably anticipated through testimony that he was boiling potatoes on the stove.  It is certain beyond peradventure that the plaintiff was using the stove as reasonably anticipated.  Assume, however, that the manufacturer has warned that the user of its stove should not peer into a boiling pot to check the progress of the food being prepared and that the plaintiff was looking into the boiling pot when the stove exploded.  The manufacturer cannot, by denying that the plaintiff's damages arose out of a reasonably anticipated use, place a burden on the plaintiff to come forward with "affirmative evidence" that the manufacturer should have expected that users, while using the stove to heat food, would peer into boiling pots.  This would be absurd.  First, the stove's reasonably anticipated use is to heat the contents of pots and pans placed on burners.  The plaintiff discharges his burden by proving that he was boiling potatoes.  His damages arose out of this reasonably anticipated use.  That he was peering into the pot of potatoes does not change this fact.  To be sure, looking in the pot may have affected the severity of the plaintiff's injuries resulting from the explosion.  The defendant may be able to prove that the plaintiff's damages were more severe because his face was scalded with hot water.  If the defendant can show that, given the warning, it was negligent to peer into the pot, then the defendant will have to pay only that portion of the plaintiff's injuries not attributable to the plaintiff's negligence.  But that does not mean that the plaintiff's injuries did not arise out of a reasonably anticipated use.  The defendant should not be able to short-circuit the plaintiff's cause of action solely because he peered into the boiling pot.

[24]The majority maintains that had Isuzu warned its jack users not to use the jack while changing a tire, such a warning would be legally ineffective, as this use is "unquestionably [a] reasonable" use.  Slip Op. at 17 n.5.  This may be the case, but there is every

In some cases, the plaintiff discharges his summary judgment burden on the issue of reasonably anticipated use simply by presenting evidence of the facts surrounding the accident.  A warning is simply one factor that the jury should take into consideration when resolving the essentially factual question of whether the plaintiff's use of a product was reasonably anticipated.  Nothing in the LPLA elevates a warning to a special status that makes it a talisman for resolving the reasonably anticipated use issue.  Moreover, I do not believe that *Lockart* should be read to absolve the manufacturer of liability when a plaintiff has disregarded a warning.  To the extent that *Lockart* would support a contrary reading, it should be overruled.

In this case, the presence of the warnings not to get under a car that is held up only by a jack did not metaphysically transform Kampen's otherwise reasonably anticipated use of the jack — to elevate the car and hold it aloft temporarily — into a use that the manufacturer should not have reasonably anticipated.  Had Kampen heeded Isuzu's warning, in all likelihood he would have minimized his damages, but he would not have prevented the collapse of the jack, nor would he necessarily have avoided all the damages that arose from the product's failure to keep the

---

indication in the majority opinion that the plaintiff who uses a defective jack for such a purpose would still be required to offer affirmative evidence that such a use was reasonably anticipated in light of the contrary warning.  If the majority would allow a tire-changing plaintiff to reach a jury without such expert testimony, it is by no means clear where it would draw the line between "unquestionably reasonably anticipated" uses that are so obvious that expert testimony is not required and those uses that are not.

vehicle aloft, as it was designed to do.  Kampen discharged his summary judgment burden by presenting evidence that he used the jack to raise the car and to keep it raised, the very function for which the manufacturer designed, built, and supplied the jack.  What Kampen did thereafter, without so much as touching the jack or the car, is wholly irrelevant — wholly lacking in nexus — to the reasonably anticipated use issue.  Consequently, summary judgment in favor of Isuzu on the basis of the reasonably-anticipated-use element constitutes reversible error. Accordingly, I dissent.